102 P.3d 1075

**STATE of Hawai'i, Plaintiff–Appellee**

v.

**Jasmine ELENEKI, Defendant–Appellant.**

**No. 25167.**

Supreme Court of Hawai'i.

Dec. 22, 2004.

178

Cindy A.L. Goodness, Deputy Public Defender, on the briefs, for defendant-appellant.

Richard K. Minatoya, Deputy Prosecuting Attorney, County of Maui, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, ACOBA, and DUFFY, JJ.; with NAKAYAMA, J., concurring separately and dissenting.

Opinion of the Court by ACOBA, J.

We hold that the police stop of Defendant–Appellant Jasmine Eleneki (Eleneki) was unlawful under Article I, Section 7[1] of the Hawai'i State Constitution, and therefore everything seized thereafter from her vehicle should have been suppressed. *State v. Bonds*, 59 Haw. 130, 138, 577 P.2d 781, 787 (1978) (stating where "[t]he stop of the vehicle constituted an unreasonable seizure[,] . . . the evidence so obtained was inadmissible"). Because such evidence was illegally seized, we vacate the April 18, 2002 judgment of conviction of the circuit court of the second

1. Article I, section 7 of the Hawai'i State Constitution provides that:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

Similarly, the Fourth Amendment of the United States Constitution provides that:

circuit[2] (the court) and remand the case for disposition in accordance with this opinion.

I.

On May 9, 2001, Plaintiff–Appellee State of Hawai'i (the prosecution) filed a five-count complaint in the court charging Eleneki with drug related offenses. On August 15, 2001, Eleneki filed a motion to suppress evidence recovered from Eleneki's vehicle after the stop. On November 13, 2001, and December 13, 2001, the court conducted hearings on the motion to suppress. On February 7, 2002, the court denied the motion to suppress and issued its "Findings of Fact ("findings")," Conclusions of Law ("conclusions"), and Order Denying [Eleneki's] Motion to Suppress Statements and Evidence ("order")." The court entered the following pertinent and unchallenged findings:

1. All events and occurrences giving rise to the charges contained in the indictments herein occurred in the County of Maui, State of Hawaii, and venue is properly in the above-entitled [c]ourt;

2. This [c]ourt has jurisdiction over Defendant and this case and cause;

3. On April 30, 2001, at about midday, Sergeant Anthony Poplardo and other officers of the MPD vice narcotics division executed two search warrants on Kihei residences located in the Uwapo Road Apartments.

4. The tenant of one of those apartments, Scott Chong ["Chong"], was arrested for the offense of Promoting a Dangerous Drug in the Third Degree, methamphetamine, as was an occupant of the second apartment that was also the subject premises of a search warrant. That the occupants of both apartments

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In applying Article I, Section 7, we may consider federal caselaw.

2. The Honorable Shackley F. Raffetto presided.

were working in conjunction to distribute methamphetamine;

5. Sergeant Poplardo spoke with ... Chong and the other individual arrested at the Wailuku police station;

6. Sergeant Poplardo knew ... Chong for over one year. Chong provided information on numerous occasions to both Sergeant Poplardo and other vice narcotics officers, and was considered a reliable informant;

. . . .

8. Chong and the other individual arrested at the Uwapo Apartments on April 30, 2001, both informed Sergeant Poplardo that [Eleneki] was a supplier of Crystal Methamphetamine and cocaine in the Kihei area;

. . . .

10. *That on the evening of April 30, 2001,* after speaking with Sergeant Poplardo, ... *Chong was released from police custody. Chong was picked up by a female in a white Chrysler PT Cruiser, and Sergeant Poplardo recognized the driver of the PT Cruiser to be the Defendant;*

11. *On the morning of May 1, 2001, Sergeants Anthony Poplardo and Chris Navarro were looking for ... Chong.* The purpose of seeking ... Chong was *to speak to him regarding the distribution of drugs and to serve him with an outstanding arrest warrant ...*;

12. That the officers were in an unmarked police car when they saw the white Chrysler PT Cruiser, License Number MGH 494 in the parking lot at 1900 Main Street, Wailuku, near the Minute Stop store;

13. That *Sergeant Poplardo could see that [Eleneki] was the driver of the car,* and that there were two other occupants in the car; *however, he was unsure if ... Chong was one of the passengers;*

14. *Sergeant Poplardo followed the vehicle* east on Main Street, then on to Kaahumanu Avenue, then onto Wahine Pio Drive, *then stopped the car* using blue light and siren. The car was stopped near Keopulani Park at approximately 11:15 a.m. or 11:20 a.m.;

. . .

25. At approximately 11:30 a.m., Officer William Gannon arrived with his drug detection dog "BEN", and Sergeant Poplardo turned the investigation over to him;

26. "BEN" alerted to the vehicle, and Officer Gannon then seized the vehicle and had it towed to the Wailuku Police Station;

27. That Sergeant Poplardo and Officer Gannon obtained a search warrant, Number 2001–48, the subject premises being the white Chrysler PT Cruiser, Hawaii License number MGH 494;

28. That on May 1, 2001, at 6:50 p.m., the search warrant was executed, and [certain] items were recovered, and photographs of same were entered into evidence for purposes of th[e] hearing[.]

(Emphases added.)

Based on its findings, the court issued the following relevant conclusion:

4. The [c]ourt finds that with respect to the traffic stop, Sergeant Poplardo *clearly possessed information that would cause a person of reasonable caution to believe that criminal activity was afoot and that the action taken was appropriate.* Taking into account Sergeant Poplardo's knowledge that Scott Chong was a user of drugs who associated with Defendant, information provided, that Defendant was a known supplier of drugs, and also the existence of an outstanding arrest warrant for Scott Chong, along with other factors, a reasonable person would clearly suspect that the criminal activity was afoot, and the appropriate action was to conduct an investigative stop of the vehicle.

(Emphasis added.)

On February 19, 2002, Eleneki entered a conditional plea of no contest to Counts I through V and reserved her right to seek appellate review of the motion to suppress. Based on the court's findings, the evidence recovered was material proof of the offenses for which she was convicted. On April 18, 2002, judgment was entered and Defendant was convicted as charged of (1) promoting a dangerous drug in the first degree, Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i)

(Supp.2002) (Count I); (2) prohibited acts related to drug paraphernalia, HRS § 329–43.5(a) (1993) (Counts II and IV); (3) promoting a dangerous drug in the second degree, HRS § 712–1242(1)(b)(i) (1993) (Count III); and (4) promoting a detrimental drug in the third degree, HRS § 712–1249(1) (1993). She was sentenced to concurrent terms of incarceration. On June 17, 2002, Eleneki filed a notice of appeal challenging the April 18, 2002 judgment.

■ On appeal, Defendant challenges, *inter alia*, the court's conclusion 4 that "with respect to the traffic stop, Sergeant Poplardo clearly possessed information that would cause a person of reasonable caution to believe that criminal activity was afoot[.]" "We review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was right or wrong." *State v. Kauhi*, 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) (internal quotation marks and citation omitted).

## II.

■ It is axiomatic that "stopping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Hawai'i Constitution, even though the purpose of the stop is limited and the resulting detention quite brief." *State v. Powell*, 61 Haw. 316, 320, 603 P.2d 143, 147 (citations omitted). A warrantless seizure is presumed invalid "unless and until the prosecution proves that the ... seizure falls within a well-recognized and narrowly defined exception to the warrant requirement." *State v. Prendergast*, 103 Hawai'i 451, 454, 83 P.3d 714, 717. *See also State v. Barnes*, 58 Haw. 333, 335–37, 568 P.2d 1207, 1209–11 (1977) (holding that warrantless arrest of a defendant, who had been in contact minutes before with an alleged drug supplier, was a valid stop pursuant to the exception recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ "In determining the reasonableness of wholly discretionary automobile stops, this court has repeatedly applied the standard set forth in *Terry*." *Powell*, 61 Haw. at 321, 603 P.2d at 147–48. The "narrowly defined exception to the warrant requirement" recognized by *Prendergast* is that "a police officer may stop an automobile and detain its occupants if that officer has a 'reasonable suspicion' that the person stopped was *engaged in criminal conduct.*" *Prendergast*, 103 Hawai'i at 454, 83 P.3d at 717 (emphasis added) (citing *State v. Bolosan*, 78 Hawai'i 86, 94, 890 P.2d 673, 681 (1995)).

■ In that connection, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (internal quotation marks and citations omitted); *see also Powell*, 61 Haw. at 321, 603 P.2d at 148 (quoting *Barnes*, 58 Haw. at 338, 568 P.2d at 1211). A seizure or stop based on "reasonable suspicion," then, is tied to "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity[,]" *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), or "is wanted for past criminal conduct[,]" *id.* at 417 n. 2, 101 S.Ct. 690.

## III.

In this case, as mentioned, the court stated in conclusion 4 that, "with respect to the traffic stop, Sergeant Poplardo clearly possessed information that would cause a person of reasonable caution to believe that criminal activity was afoot." Contrary to the court's conclusion, there were no specific facts articulated by the police that would warrant a person of reasonable caution to believe that criminal activity was afoot. None of the findings indicate that the police observed any criminal activity concerning the vehicle prior to the stop. None of the officers testified that criminal activity had occurred with respect to the vehicle prior to the stop. Hence, the court was wrong in concluding that the stop was justified.[3]

---

**3.** The dissenting and concurring opinion [hereinafter referred to as dissent or dissenting opinion]

acknowledges that "[t]he present stop arises in circumstances factually distinguishable from

■ On appeal, in contrast to the court's conclusion 4, the prosecution argues that the stop was proper "in furtherance of [Sergeant Poplardo's] *investigation* to find Mr. Chong to execute a bench warrant."[4] (Emphasis added.) Assuming *arguendo* this was a valid basis for a stop, no reasonable suspicion that Chong occupied the vehicle supported the stop. The record and the inferences to be drawn therefrom indicate that prior to the stop (1) on the evening of April 30, 2001, Chong was picked up from the station by Eleneki in her vehicle; (2) on May 1, 2001, the next day, police officers observed Eleneki's vehicle at a convenience store; (3) the officers could not identify the vehicle's other two occupants; (4) thereafter, the police followed Eleneki's car; and (5) the officers stopped the car at approximately 11:15 or 11:20 A.M.

The stop thus rested on the slender fact that Chong had been picked up by Eleneki in her vehicle at the police station on the previous night. That fact would not lead a person of reason, exercising caution, to draw a rational inference that at 11:15 or 11:20 A.M., the next day, Chong would be an occupant of Eleneki's vehicle as it was parked at a convenience store. That Chong had been arrested for promoting a dangerous drug in the third degree and had informed Sergeant Poplardo that Eleneki was a supplier of drugs, did not constitute facts from which it reasonably could be inferred that Chong would be found in Eleneki's vehicle at the time of the stop. Viewed objectively, no facts were articulated by the police to indicate Chong would remain in Eleneki's vehicle from April 30, 2001, until nearly noon on the next day or that he would re-enter the vehicle before that time.

Indeed, according to the evidence received at the hearing, Sergeant Poplardo's "main intention in pulling [Eleneki] over was to *inquire [as to] where Scott Chong was.*" (Emphasis added.) *See infra* note 6. The police did not testify that they believed Chong was in the vehicle because there was no basis to believe that Chong was in the car.

> [DPA]: And with respect to the occupant of the car when you stopped the white Chrysler PT Cruiser, *do you know whether or not Scott Chong was seated in that car?*
>
> [Sergeant Poplardo]: *No, I didn't know. I was hoping he would be.*
>
> [DPA]: *And prior to walking up to the car, did you know he was in the car?*
>
> [Sergeant Poplardo]: *No.*

(Emphases added.) Sergeant Poplardo's testimony that he saw "two passengers whose faces were obscured by the car's tinted windows," would not support an inference that Chong was one of the occupants. To the contrary, it confirms that the police had no specific or articulable basis to believe that Chong was in the vehicle.[5] Hence, the police lacked reasonable suspicion to stop Eleneki's vehicle.[6]

---

those to which 'reasonable suspicion' has traditionally applied," dissenting opinion at 190, 102 P.3d at 1088, and concludes that Eleneki's seizure was "not founded upon the pressing law enforcement need to ferret out imminent or ongoing crime[.]" Dissenting opinion at 190, 102 P.3d at 1088.

4. The court elicited testimony that the police were attempting to serve a warrant:

> [DPA]: Okay. And at that time were you looking for someone?
> [Sergeant Poplardo]: *Yes, I was trying to relocate Scott Chong.*
> Q: And for what purpose?
> A: *We needed to talk to him some more, and he had an outstanding bench warrant that was not realized the day before.*
> [Q]: Now, on April 30th, had you received information regarding Jasmine Eleneki?
> The Court: Excuse me. *You mean you were looking for him to arrest him on the warrant.*

> [Sergeant Poplardo]: *Yes.*
> The Court: Okay.
> [DPA]: Thank you, your Honor.
> (Emphases added).

5. The following testimony was elicited:

> [DPA]: Could you see any other occupants in the car?
> [Sergeant Poplardo]: I could tell there were two other occupants, *but due to the tint, I couldn't recognize them.*
> Q: Could you tell whether they were male or female?
> [Sergeant Poplado]: I thought they were both males.
> (Emphasis added.)

6. Our determination that the police did not have reasonable suspicion to stop the vehicle in this case, *see* dissenting opinion at 190 n. 14, 102 P.3d at 1090 n. 14, does not hinge upon Sergeant Poplardo's subjective reason for stopping Ele-

## IV.

The dissent characterizes the stop as being " 'the essence of good police work' " dissenting opinion at 194, 102 P.3d at 1092, and that officers should be "free to act upon their 'common sense judgments.' " *Id.* (quoting *Illinois v. Wardlow,* 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). In that regard, the purpose of the stop here was to "relocate" Chong "to talk to him some more" and to arrest him on the bench warrant, *see supra* note 4. Chong's arrest warrant was dated April 12, 2001. Arguably, good police work should have led the police to execute the warrant after they had arrested Chong and had him in their custody on April 30, 2001, or to search for Chong at his own home, once the police became aware of the outstanding bench warrant. *See People v. Spencer,* 84 N.Y.2d 749, 622 N.Y.S.2d 483, 646 N.E.2d 785, 789 (1995) (holding that automobile stop of a defendant, who police wanted to question regarding a suspect, was unreasonable, especially in light of the "fact that the officers had not even searched for the suspect at his own home when they decided to stop defendant ... [because defendant] was a *possible* or even probable source of information regarding the suspect's whereabouts" (emphasis in original)).

Additionally, an officer's "common sense judgments" must still comport with the *Ter-*

neki, but rather, upon the utter lack of any "objective manifestation" that Eleneki was, or was about to be, "engaged in criminal activity." *Cortez,* 449 U.S. at 417, 101 S.Ct. 690. The sergeant's testimony merely confirms that no specific articulable basis existed to justify stopping Eleneki. Therefore, the string of cases cited by the dissent for the proposition that "subjective motives, intentions, and proclivities" of the officers should "play no role" is inapposite. Dissenting opinion at 190 n. 14, 102 P.3d at 1090 n. 14.

Moreover, the dissent's reliance upon *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), is misplaced. In *Whren,* the defendants were charged with various federal drug violations after the police stopped their vehicle and observed bags of crack cocaine in the defendant passenger's hands. *Id.* at 808–09, 116 S.Ct. 1769. The defendants challenged the legality of the stop, asserting that even though the officer had probable cause to believe the traffic code had been violated, *see id.* at 810, 116 S.Ct. 1769, the officer's ground for approaching the

*ry* reasonable suspicion test. In *Cortez,* the United States Supreme Court required that the police "assessment of the whole picture must yield a particularized suspicion .... based upon all the circumstances." 449 U.S. at 418, 101 S.Ct. 690. The border agents in *Cortez* stopped a pickup truck (1) seen earlier in the evening; (2) in an area known as a crossing point for illegal aliens; and (3) as part of a two-month investigation of a particular pattern of illegal smuggling operations resulting in specific clues including shoeprint tracks left by a particular smuggler. *Id.* at 419, 101 S.Ct. 690. Thus, the court held that the stop was justified because "based upon the whole picture, [the officers], as experienced Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity." *Id.* at 421–22, 101 S.Ct. 690. In this instance, however, the officers were unable to articulate *any* objective observations that placed Chong in the car at the time of the stop. Indeed, as mentioned previously, the police officers did not testify they believed Chong was in the vehicle or that they had observed him in the car prior to the stop.

## V.

We also note that the "main" and "initial" reason for the stop proffered by the police would not authorize the stop.[7] Where

vehicle was pretextual. *Id.* at 809, 116 S.Ct. 1769. Applying the United States Constitution, the Supreme Court "flatly dismissed the idea that an ulterior motive might serve to *strip* [police officers] of their legal justification" and held that "the constitutional reasonableness of traffic stops [does not] depend[ ] on the actual motivations of the individual officers involved." *Id.* at 812–13, 116 S.Ct. 1769 (emphasis added). Here, in contrast to the facts in *Whren,* no such objective basis for the stop existed.

7. Sergeant Poplardo testified that his "main" and "initial" intention in stopping Eleneki was as follows:

[Defense Attorney]: And your testimony this morning is that you pulled [Eleneki] over because you—the intention was for further investigation; is that correct?
[Sergeant Poplardo]: Yes.
Q: Okay. And this further investigation would be of the Scott Chong case or of the Jasmine Eleneki case?
A: Scott Chong.

a stop is made only for the purpose of questioning the defendant about a third person, "the narrow exception of *Terry,* which allows investigative stops on grounds short of probable cause cannot be stretched so far as to allow detentive stops for generalized criminal inquiries." *United States v. Ward,* 488 F.2d 162, 169–70 (9th Cir.1973) (en banc). *See also Spencer,* 622 N.Y.S.2d 483, 646 N.E.2d at 789 (stating "that 'the Fourth Amendment does not permit the stopping of potential witnesses to the same extent those suspected of crime'") (quoting 3 Lafave, Search and Seizure § 9.2[b] at 354 [2d ed.]) and *Hawkins v. United States,* 663 A.2d 1221, 1226–27 (D.C.1995) (recognizing the requirement of "articulable suspicion" for "seizures initiated for investigatory purpose[s] [that] focus ... on suspects" and that the presence of "exigent circumstances" justifies police stopping witnesses).

Such a generalized detentive stop would not be valid because: (1) "founded suspicion that criminal activity is afoot is a minimum requirement for any lawful detentive stop," *Ward,* 488 F.2d at 169; (2) there are no crimes "afoot" with "no exigent circumstances warranting the extreme nature of a vehicular stop by a siren on a public street," *id.;* and (3) "the stop [is] not made pursuant to [an officer's] founded suspicion that the *detainee* [is] involved or about to be involved

> Q: Okay. *So your main intention in pulling [Eleneki] over was to inquire where Scott Chong was?*
> A: *Yes.*
> ....
> Q: But the *only intention you had in pulling her over was to find out where Scott Ching was; right?*
> A: *That was the initial reason for pulling her over, yes.*
> Q: *The initial—*
> A: *Yes.*
> Q: *—reason?*
> A: *Yes.*
> (Emphases added.)

The dissent concedes a stop for this reason would be invalid, stating its disagreement "with the State's rather novel contention that an investigative stop is reasonable, so long as the individual targeted is viewed by law enforcement at the time of the stop as a potential source of information concerning a non-exigent collateral law enforcement matter." Dissenting opinion at 195, 102 P.3d at 1093.

in criminal activity." *Id.* (emphasis in original). *See also Hawkins,* 663 A.2d at 1226 (stating that "the police are justified in stopping witnesses only where *exigent circumstances* are present, such as where a crime has recently been reported") (emphasis in original), and *Spencer,* 622 N.Y.S.2d 483, 646 N.E.2d at 790 (holding that traffic stop of defendant is not justified where "there was no genuine need for so immediate and intrusive an action").

## VI.

In light of the foregoing, there is no legitimate basis for creating a new exception to the warrant requirement as suggested by the dissent.[8] The dissent characterizes this new exception as one where "officers briefly stop a moving vehicle to investigate their reasonable suspicion that the person named in the warrant is among its occupants."[9] Dissenting opinion at 191, 102 P.3d at 1089. The dissent cites no authorities for the proposition that the stop here is authorized by the "public interests" it identifies as: (1) "the prompt apprehension of persons who disrespect the constraints upon personal liberty attendant to their probationary release"; (2) "public pursuit of rehabilitation"; and (3) "the collective desire to foster an environment of effective crime prevention [by] re-

**8.** While we understand the dissent's position, we do not "announce[]" a "constitutional rule" as the dissent maintains, dissenting opinion at 185, 102 P.3d at 1083, inasmuch as (1) case law, as discussed herein, covers the circumstances and the evidence adduced in this particular case; and (2) based on such evidence, there was no "objective reason," *see* dissenting opinion at 185, 102 P.3d at 1083, to warrant the traffic stop of Eleneki. Further, to clarify, what "stretches the narrowly defined exception to the warrant requirement," *see* dissenting opinion at 185, n. 1, 102 P.3d at 1083 n. 1, is the proposition that "public interests" authorize a traffic stop of a third person, without "suspicion that criminal activity is afoot," *Ward,* 488 F.2d at 169, in order to locate a probation violator who is not, under an objective view of the facts, an occupant of that vehicle.

**9.** The dissent acknowledges that "private interests implicated by a vehicular stop to ascertain an obscured passenger's identity are no less significant than those infringed by other temporary vehicular detentions." Dissenting opinion at 191 n. 12, 102 P.3d at 1089 n. 12.

taking custody of a felon who—by breaching the terms of his probation—signals his possible return to criminal behavior." Dissenting opinion at 191, 102 P.3d at 1089. This suggested expansion of the *Terry* rule "stretches the narrowly defined exception [to the warrant requirement] to cover the situation." *State v. Ortiz*, 67 Haw. 181, 193, 683 P.2d 822, 830 (1984) (Nakamura, J., dissenting, Wakatsuki, J., joining); *see also id.* at 191, 683 P.2d at 829 (explaining that the ICA "strained to place the search and seizure [of a defendant's knapsack] beyond the reach of the constitutional protections by fashioning a novel 'plain feel' rule from 'the limitations and rationale of the plain view rule' ").

In this case (1) the stop was made after the police received information the night before that Eleneki was distributing drugs; (2) the officers did not identify the other occupants of Eleneki's car before the stop; (3) the officers detained Eleneki even after determining that Chong was not in the vehicle; (4) the detention was for the purpose of permitting a canine search for drugs unrelated to the apprehension of Chong, but related to information of drug activity the police had obtained over a two year period; and (5) the police had no search warrant for the vehicle. The expansion of *Terry* as proposed would permit the seizure of persons without reasonable suspicion, probable cause, or a warrant, as occurred here.

## VII.

Additionally, another exception to the warrant requirement is not warranted inasmuch as the facts in this case exemplify circumstances that have already been considered under the existing *Terry* rule. The Supreme Court of Nebraska in *State v. Colgrove*, 198 Neb. 319, 253 N.W.2d 20 (1977), decided a case with strikingly similar facts to the one before us. In *Colgrove*, two officers were attempting to locate two female suspects, for both of whom the officers had outstanding arrest warrants. *Id.* at 21. The officers

stopped defendant's car on their belief that the suspects might be in defendant's car. *Id.* at 22. The *Colgrove* court noted the following undisputed facts:

"When the officers stopped their own cars they became aware that there were three males in the car and no women.... *The officers acknowledged that they had observed no violations of law by the driver of the car or its occupants. Neither the car nor its occupants had done anything to arouse the suspicion of the officers.* Neither were the officers investigating any crime which would give them occasion to make an investigatory stop of [defendant's] vehicle."

*Id.* (emphasis added). However, the officers persisted in checking the identity of the occupants of the car with the purpose of "determin[ing] that the occupants of the car were not the [two female suspects]." *Id.*

In beginning its analysis, the Nebraska supreme court stated that "[t]he initial question in this case is, was a stop and a brief investigation reasonable in this instance?" *Id.* at 23. In answering that question, the *Colgrove* court said that "*there was nothing in the circumstances or within the officers' knowledge, as demonstrated by the record, which gave any ground whatever for an investigatory stop such as is approved by Terry.*" *Id.* (emphases added). That court struck down the stop as unreasonable, indicating that the undisputed facts "show that the actions of the defendant and his companions gave no reasonable ground to suspect, nor did the officers have information of any kind which could reasonably lead them to any conclusion that the occupants ... were committing, or were about to commit, or had committed any crime." *Id.* The *Colgrove* court thus held "that the *investigatory stop* in this case was in violation of the Fourth Amendment to the Constitution of the United States, and Article I, section 7, of the Constitution of Nebraska."[10] *Id.* (emphasis added).

10. In light of the "initial question" posed in *Colgrove*, 253 N.W.2d at 23, the analysis following, and the ultimate conclusion, we do not read *Colgrove* as reaching the issue of "an officer's authority to stop a vehicle to investigate his or her reasonable suspicion that a person named in a valid arrest warrant is among the vehicle's occupants," as the dissenting opinion contends, *see* dissenting opinion at 191–92 n. 13, 102 P.3d at 1089–90 n. 13. Therefore, *Colgrove* does not

The Ninth Circuit, in *Ward*, reiterated that "[i]n conformity with *Terry*, ... a founded suspicion that criminal activity is afoot is a minimum requirement for any lawful detentive stop." 488 F.2d at 169. In *Ward*, FBI agents stopped defendant in his automobile in order to interview him about a federal fugitive. *Id.* at 167. The Ninth Circuit concluded the "FBI's stop of [defendant's] car to be an unreasonable intrusion under the Fourth Amendment." *Id.* at 170. This stop was unreasonable because: the "FBI agents did not stop defendant's car in connection with any particular crime[;] .... [t]here was no emergency situation nor any need for immediate action[;] .... and most significantly, the stop was not made pursuant to the agent's founded suspicion that the [detained defendant] was involved or about to be involved in criminal activity." *Id.* at 169. Ultimately, the court held "that the materials discovered as a result of the stop should have been suppressed as the fruit of the unlawful stop." *Id.* at 170.

In *Spencer*, the Court of Appeals of New York considered the issue of "whether the police may stop a moving vehicle in order to request information of the driver concerning the whereabouts of a criminal suspect." 622 N.Y.S.2d 483, 646 N.E.2d at 786. In *Spencer*, two New York police officers, with the complainant present, conducted an automobile stop of the defendant, whom they believed was a friend of a person they suspected had committed an assault the previous day. *Id.* at 786–87. The New York court held that the "police could [not] validly stop [defendant's] vehicle in order to request information of him." *Id.* at 787.

It explained that "[p]olice stops of automobiles in this State are legal only pursuant to routine, nonpretextual traffic checks to enforce traffic regulations or when there exists at least a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or about to commit a crime." *Id.* at 787–88. "[T]he stop, [then], was proper only if the officers had a reasonable suspicion of criminal activity." *Id.* at 788.

## VIII.

The police engaged in a seizure bereft of reasonable suspicion or probable cause. The law prohibits the circumvention of the warrant requirement by resorting to such practices. Accordingly, the court's April 18, 2002 judgment of conviction is vacated and the case is remanded for disposition consistent with this decision.

Concurring and Dissenting Opinion by NAKAYAMA, J.

The constitutional rule announced today prohibits the use of investigative traffic stops in all instances where there is objective reason to suspect that an alleged probation violator who is named in a valid arrest warrant is among a vehicle's occupants.[1] Majority at 180–81, 102 P.3d 1080–81. I cannot agree that the majority's decision to forbid a proven and minimally intrusive law enforcement tool under these circumstances is necessary to safeguard the public from unreasonable seizures. I therefore dissent from the majority's holding that the investigative traffic stop of Defendant-appellant Jasmine Eleneki (Eleneki) was unlawful at its inception. However, because I conclude that Eleneki's detention exceeded the stop's lawful scope, I

"acknowledge," *id.*, such a proposition. In the context of the opinion, the quote "[w]hen it became apparent that the persons for whom the officers were looking were not in the [defendant's] car[,] that vehicle should have been permitted to proceed," relied on by the dissent, *id.* at 191–92 n. 13, 102 P.3d at 1089–90 n. 13 (quoting *Colgrove*, 253 N.W.2d at 23, was an observation concerning the actions of the officers following what the *Colgrove* court had already ruled was an "investigatory stop" "in violation" of the United States and Nebraska constitutions.) *Colgrove*, 253 N.W.2d at 23. The *Colgrove* dissent, to the effect that the stop was "legitimate," *id.* at 24, was precisely the position rejected by

the majority in *Colgrove*. Hence, as indicated *supra* and contrary to the dissent's contention, the *Colgrove* majority did in fact hold "that the stop was unlawful at its inception." *See* Dissenting opinion at 191–92 n. 13, 102 P.3d at 1089–90 n. 13.

1. Specifically, the majority claims that there is no "legitimate basis" for sanctioning such a stop under the fourth amendment or article I, section 7, as any such rule would "stretch[ ] the narrowly defined exception to the warrant requirement to cover the situation." Majority at 180, 181, 102 P.3d at 1080, 1081 (brackets omitted).

concur with the majority that the circuit court erred in denying her motion to suppress.

## I. BACKGROUND

### A. Factual Background

The circuit court's findings of fact (FOFs), and additional relevant facts that are consistent with the FOFs and are supported by the record, can be summarized as follows:

At around noon on April 30, 2001, Maui Police Department (MPD) Sergeant Anthony Poplardo (Sergeant Poplardo) assisted in executing search warrants at several apartments in Kihei, Maui. Those searches resulted in the discovery of crystal methamphetamine, and led to the arrests of two individuals suspected of distributing the illegal substance. Among those arrested was Scott Chong (Chong), a police informant whom Sergeant Poplardo had known for over a year and who had provided the police with information on previous occasions. Sergeant Poplardo testified that Chong was a "reliable" informant, though he did not recall if Chong's assistance had resulted in any arrests.

Following his arrest at around noon, Chong was taken to the Wailuku police station for interrogation. During the interrogation, Chong informed Sergeant Poplardo that Eleneki "was one of [his] sources of crystal methamphetamine." This information, coupled with earlier tips from Sergeant Poplardo's other informants, convinced Sergeant Poplardo that Eleneki "was involved in the distribution of methamphetamine as an ongoing nature."

Chong was released from police custody later that night. As Sergeant Poplardo looked on, Eleneki arrived in a white Chrysler PT Cruiser to pick Chong up. Soon after Chong and Eleneki departed the station, Sergeant Poplardo learned that Chong was wanted on an outstanding bench warrant for violating his probation.

The next morning, on May 1, 2001, Sergeant Poplardo and his partner, MPD Sergeant Christopher Navarro (Sergeant Navarro), spotted a white Chrysler PT Cruiser enter the parking lot of the Minute Stop convenience store in Wailuku, Maui. Eleneki was behind the wheel, accompanied by two passengers whose faces were obscured by the car's tinted windows.

Being apprised of Chong's outstanding arrest warrant and upon seeing Eleneki, Sergeant Poplardo "wanted to . . . see if [Chong] was in that car." Accordingly, Sergeants Poplardo and Navarro followed the PT Cruiser as it exited the parking lot, and trailed Eleneki for about five minutes before Sergeant Poplardo directed her to stop using his vehicle's blue light and siren.

Eleneki stopped her car in a reasonable amount of time. As Sergeants Poplardo and Navarro approached on foot, Sergeant Poplardo scanned the passenger compartment and confirmed that Chong was not in the vehicle, and that no drug paraphernalia or suspicious packages lay in plain view.

Nevertheless, Sergeant Poplardo proceeded further with the investigative stop. After introducing himself as a police officer and requesting Eleneki's driver's license, Sergeant Poplardo asked Eleneki to identify her passengers. Eleneki stated that the female in the back seat was named "Charmaine," but claimed that she did not know the name of her front seat passenger. Sergeant Poplardo then asked Eleneki if she knew of Chong's whereabouts, since "initially I was looking for him, and I know that she knows him." Sergeant Poplardo became suspicious when Eleneki "claimed that she did not know [Chong] at all."

Sergeant Poplardo testified that, throughout his questioning, Eleneki was "mumbling a lot," "wouldn't look him straight in the face," and appeared "nervous," "tense," and "fidgeting." Believing that Eleneki might feel more at ease in private, Sergeant Poplardo "invited" her to step out of the vehicle so that they could talk away from the car's other occupants. While Sergeant Poplardo testified that he merely "asked [Eleneki] to" exit the vehicle, Sergeant Poplardo never indicated to Eleneki that she was free to deny his request or otherwise leave.

Sergeant Poplardo and Eleneki proceeded to the back of the car, where Sergeant Poplardo confronted Eleneki with his "strong

suspicions" that she was "involved with drug dealing." After Eleneki protested that she "didn't have any drugs on her," Sergeant Poplardo sought her consent to have himself and Sergeant Navarro search her vehicle. Eleneki, however, rebuffed Sergeant Poplardo and refused to acquiesce to any such search. She instead advised Sergeant Poplardo that he would have to get a search warrant to look inside her car.

Eleneki's refusal to submit her vehicle to a consensual search prompted Sergeant Poplardo to question her "a little bit more." Because Eleneki's responses "seemed evasive to most of the questions I was asking," Sergeant Poplardo requested assistance from other narcotics officers in performing a "canine screen" of Eleneki's car. In preparation for the screen, Sergeants Poplardo and Navarro ordered all occupants from the car. They then queried whether Eleneki's passengers owned anything in the vehicle, to which Eleneki replied that she was the sole owner of all of the car's contents.

MPD narcotics officer William Gannon (Officer Gannon) responded to Sergeant Poplardo's call for assistance. Accompanying Officer Gannon was Ben, a dog trained in narcotics detection. Officer Gannon and his dog arrived approximately fifteen minutes after Sergeants Poplardo and Navarro first stopped Eleneki.

During the canine screen, Ben "alerted" by pawing on the passenger side front door, indicating the presence of illegal narcotics. The front passenger window was open, and Ben stuck his head about three inches into the passenger compartment. Officer Gannon informed Sergeant Poplardo of the alert, and the officers proceeded to 'arrest Eleneki. The police towed her vehicle to the Wailuku police station, where it was stored until officers received a warrant to search its interior.

Upon obtaining the warrant, Officer Gannon searched the vehicle. His inspection uncovered a number of illegal narcotics and

drug paraphernalia, including twenty-four grams of packeted crystal methamphetamine, twenty-eight grams of cocaine, three grams of marijuana, an electronic digital gram scale, a small packet of baking soda, a glass pipe with white brownish residue, a "drug tally" note pad listing the "street names" of crystal methamphetamine and cocaine, empty clear Ziplock packets and manila envelopes, and $762 in cash.[2]

## B. Procedural History

Eleneki was indicted on Counts I–V. On August 15, 2001, Eleneki filed a motion to suppress evidence recovered based on alleged violations of article I, section 7, of the Hawai'i State Constitution, and the fourth and fourteenth amendments to the United States Constitution. On February 7, 2002, the circuit court denied Eleneki's motion to suppress. In denying the motion, the circuit court entered the following pertinent and unchallenged FOF's:

10. That on the evening of April 30, 2001, after speaking with Sergeant Poplardo, Scott Chong was released from police custody. Scott Chong was picked up by a female in a white Chrysler PT Cruiser, and Sergeant Poplardo recognized the driver of the PT Cruiser to be the Defendant;

11. On the morning of May 1, 2001, Sergeants Anthony Poplardo and Chris Navarro were looking for Scott Chong. The purpose of seeking Mr. Chong was to speak to him regarding the distribution of drugs and to serve him with an outstanding arrest warrant;

12. That the officers were in an unmarked police car when they saw the white Chrysler PT Cruiser, Licence Number MGH 494 in the parking lot at 1900 Main Street, Wailuku, near the Minute Stop store;

13. That Sergeant Poplardo could see that the DEFENDANT was the driver of the car, and that there were two other

2. In explaining the relevance of the household or otherwise lawful items he uncovered, Officer Gannon testified that drug dealers typically used baking soda as a "cutting agent" to dilute the purity of cocaine, and that electronic scales assisted in measuring the weight of illegal narcotics for sale. He further testified that drug dealers often placed drugs in plastic packets for individual distribution, and that the $762 in cash was consistent with drug sales of cocaine and crystal methamphetamine.

occupants in the car; however, he was unsure if Scott Chong was one of the passengers;

14. Sergeant Poplardo followed the vehicle east on Main Street, then on to [sic] Kaahumanu Avenue, then onto Wahine Pio Drive, then stopped the car using blue light and siren. The car was stopped near Keopulani Park at approximately 11:15 a.m. or 11:20 a.m.;

15. Sergeant Poplardo approached DEFENDANT who was seated in the driver's seat, identified himself as a police officer, and asked her for her driver's license, which she provided. Defendant also told the officer that the car was a rental vehicle, and that she did not have insurance or a registration card;

16. Sergeant Poplardo then asked DEFENDANT what her passengers' names were, and she replied that she did not know the name of the male seated in the front seat, however, she identified the rear seat passenger as Charmaine Gabin;

17. That Sergeant Poplardo then asked DEFENDANT if she knew about the whereabouts of Scott Chong, and she claimed not to know him at all, contrary to what Sergeant Poplardo observed a day prior on April 30, 2001;

18. Sergeant Poplardo observed DEFENDANT to be nervous, fidgeted in her seat, would not look at Sergeant Poplardo, and mumbled when she spoke, and it appeared to Sergeant Poplardo as though Defendant did not want to speak to him in the presence of her passengers[.]

On February 19, 2002, Eleneki pleaded no contest to Counts I–V. She was thereafter sentenced to concurrent terms of imprisonment of twenty years in Count I, ten years in Count III, five years each in Counts II and IV, and thirty days in Count V. Judgment was entered on April 18, 2002. Eleneki timely appealed.

## II. STANDARD OF REVIEW

**Motion to Suppress**

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points omitted). Accordingly, "[w]e review the circuit court's ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.'" *Id.* (citations and some quotation signals omitted).

*State v. Locquiao,* 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (quoting *State v. Poaipuni,* 98 Hawai'i 387, 392, 49 P.3d 353, 358 (2002)).

*State v. Hauge,* 103 Hawai'i 38, 47, 79 P.3d 131, 140 (2003).

## III. DISCUSSION

On appeal, Eleneki argues that the circuit court erred in denying her motion to suppress, inasmuch as the absence of any observed traffic violations or signs of criminal conduct precluded the court from finding that a "reasonable suspicion" of criminal activity supported the stop. Relying on precedent from other jurisdictions, Eleneki further contends that a temporary investigative stop initiated to search for a person other than the defendant cannot qualify for exception to the warrant requirement, as the seizure does not further a sufficiently weighty public interest to justify its intrusiveness. She concludes that, because the stop and screen were unlawful, the circuit court erred in failing to suppress all resulting evidence.

The State counters that the circuit court correctly denied Eleneki's suppression motion, on the grounds that briefly detaining a driver and vehicle recently sighted carrying a wanted felon is a "legitimate reason" for departing from the general warrant requirement. The State further asserts that Eleneki's continued detention and canine screen were justified, inasmuch as her conduct towards the police during their search for Chong prolonged the officers' "reasonable suspicion" that criminal activity was afoot.

Upon review of the record, I conclude that while the investigative stop was lawful at its inception, Eleneki's continued detention during her vehicle's canine screen exceeded the

stop's lawful scope. Eleneki's contention that the evidence admitted at trial was tainted and should have been excluded is therefore correct.

## A. The Investigative Stop was Lawful at Its Inception

### 1. *"Reasonable suspicion" is the appropriate standard by which to measure the constitutionality of Eleneki's stop.*

On appeal, Eleneki argues that the investigative stop was unlawful from its inception for violating the constitutional proscription against unreasonable seizures [3] found in the fourth amendment to the United States Constitution [4] and article I, section 7 of the Hawai'i State Constitution.[5]

The constitutional provisions upon which Eleneki relies serve to " 'safeguard the privacy and security of individuals against arbitrary invasions by government officials.' " *State v. Quino*, 74 Haw. 161, 177–178, 840 P.2d 358, 366 (1992) (Levinson, J., concurring) (quoting *Camara v. Mun. Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967)); *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) ("The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government[.]"). Consonant with that purpose, the provisions mandate that government agents generally "obtain search warrants based on probable cause before effecting a search and seizure of persons or places connected to criminal activity." *State v. Barrett*, 67 Haw. 650, 653, 701 P.2d 1277, 1280 (1985) (citing *State v. Dias*, 62 Haw. 52, 609 P.2d 637 (1980)).

Beginning with *Terry v. Ohio*, however, the United States Supreme Court has recognized that a limited seizure based on less than probable cause presents no constitutional infirmity where the government interest being furthered outweighs the individual's right to be free of an intrusion that amounts to less than outright "arrest." *See* 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889 (1968); *Dunaway v. New York*, 442 U.S. 200, 210, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979) (*Terry* "defined a special category of Fourth Amendment 'seizures' so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced by a balancing test."). A police officer who briefly stops a person to investigate his "reasonable suspicion" that the detained individual is complicit in imminent or ongoing crime accordingly acts within constitutional bounds, insofar as the public interest in crime prevention and control justifies the temporary invasion of personal security that the investigative stop occasions. *See, e.g., United States v. Cortez*, 449 U.S. 411, 421, 101 S.Ct. 690, 697, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

This court adheres to the balancing test propounded in *Terry* when assessing the legality of warrantless law enforcement intrusions under article I, section 7 of the Hawai'i State Constitution.[6] Like the federal courts,

---

**3.** The State does not contest that an investigative traffic stop constitutes a "seizure" in the constitutional sense. *See State v. Prendergast*, 103 Hawai'i 451, 453–454, 83 P.3d 714, 716–717 (2004) (citing *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) and *State v. Bolosan*, 78 Hawai'i 86, 92, 890 P.2d 673, 679 (1995)).

**4.** The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**5.** Article I, section 7 of the Hawai'i State Constitution provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

**6.** *See, e.g., State v. Powell*, 61 Haw. 316, 320, 603 P.2d 143, 147 (1979) ("[W]hether or not [an

that balance of interests has led this court to conclude that "reasonable suspicion" is the appropriate standard by which to measure the constitutionality of a brief discretionary stop to investigate crime in the absence of probable cause. *See, e.g., State v. Prendergast,* 103 Hawai'i 451, 453–454, 83 P.3d 714, 716–717 (2004) (citing cases).

The present stop arises in circumstances factually distinguishable from those to which "reasonable suspicion" has traditionally applied. Unlike previous cases, the arrest warrant that made Chong the object of pursuit [7] was based upon Chong's alleged commission of a misdemeanor offense—contempt of court [8]—relating to numerous violations of his probationary terms.[9] The warrant's issuance over two weeks prior to Eleneki's stop plainly indicated that Chong was being sought to answer for an alleged crime whose completion had long since transpired.[10] The

incidental seizure of Eleneki's person and vehicle during the police effort to execute Chong's warrant was thus not founded upon the pressing law enforcement need to ferret out imminent or ongoing crime that originally justified *Terry's* narrow exception to the warrant requirement. *See Terry,* 392 U.S. at 22, 88 S.Ct. at 1880; *Prendergast,* 103 Hawai'i at 454, 83 P.3d at 717.

Where a temporary stop to investigate past criminal activity is at issue, the factors relevant to *Terry's* constitutional balance of interests may be somewhat different than those advanced by investigations of imminent or ongoing crime. In *United States v. Hensley,* the United States Supreme Court examined the constitutionality of an investigative traffic stop based on law enforcement's "reasonable suspicion" that the detained individual had participated in an armed robbery

---

investigative stop] is found to be reasonable [is dependent] upon balancing the public interest it promotes and the individual's right to be free from arbitrary interference by government officials."); *State v. Bonds,* 59 Haw. 130, 134, 577 P.2d 781, 784 (1978) (" '[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' ") (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975)); *cf. State v. Ortiz,* 67 Haw. 181, 185, 683 P.2d 822, 826 (1984) ("The reasonableness of a weapons search is determined by balancing the State's interest in searching against the individual's interest in freedom from unreasonable government intrusions."); *State v. Snitkin,* 67 Haw. 168, 172, 681 P.2d 980, 983 (1984) (whether use of narcotics detection dog was "reasonable" "should be determined by balancing the State's interest in using the dog against the individual's interest in freedom from unreasonable government intrusions").

7. Sergeant Poplardo's testimony at the suppression hearing makes clear that this was among the proffered justifications for the stop:

[DEPUTY PUBLIC DEFENDER (DPD):] And your testimony this morning is that you pulled Jasmine Eleneki over because you—the intention was for further investigation; is that correct?

[SERGEANT POPLARDO:] Yes.

[DPD:] Okay. And this further investigation would be of the Scott Chong case or the Jasmine Eleneki case?

[SERGEANT POPLARDO:] Scott Chong.

[DPD:] Okay. So your main intention in pulling Jasmine Eleneki over was to inquire where Scott Chong was?

[SERGEANT POPLARDO:] Yes.

. . . .

[DPD:] . . . [T]he only intention you had in pulling her over was to find out where Scott Chong was; right?

[SERGEANT POPLARDO:] That was the initial reason for pulling her over, yes.

. . . .

[DPD:] Okay. So you're saying that the reason you pulled her over was to find out where Scott Chong was?

[SERGEANT POPLARDO:] Well, I wanted to see if she had any knowledge *and see if he was in that car, yes.*

8. Contempt of court is a misdemeanor offense under HRS § 710–1077 (1993).

9. Chong was sentenced to a term of probation following his conviction on three counts of second degree theft and two counts of second degree forgery.

In sentencing Chong, the court imposed a number of special terms and conditions of probation. The warrant for Chong's arrest followed his alleged violation of those terms and conditions by (1) failing to report to his probation officer, (2) failing to notify his probation officer prior to his change of residence and employment, (3) failing to attend daily Alcoholics Anonymous/Narcotics Anonymous meetings, (4) failing to pay restitution, (5) failing to refrain from using or possessing alcohol or illegal drugs, and (6) failing to participate in an Intensive Outpatient Substance Abuse Treatment program.

10. Chong's arrest warrant was dated April 12, 2001.

twelve days earlier. 469 U.S. 221, 223–224, 105 S.Ct. 675, 677–678, 83 L.Ed.2d 604 (1985). The Court recognized that, at least in cases involving a completed felony-level offense, the "strong government interest in solving crimes and bringing offenders to justice" sufficed to "outweigh the individual's interest to be free of a stop and detention" of limited scope and duration. *Id.* at 229, 105 S.Ct. at 680. In striking *Terry's* balance of interests in the government's favor, *Hensley* confirmed that a *Terry* stop was a legitimate police tactic to investigate an officer's "reasonable suspicion, grounded in specific and articulable facts, that a person [the officer] encounter[ed] was involved in or [was] wanted in connection with a completed felony." *Id.*

The instant case presents the question expressly left open in *Hensley:* whether a temporary investigative stop is consistent with constitutional principles if based on law enforcement's reasonable suspicion that the person seized has committed a past misdemeanor offense. *See id.* ("We need not and do not decide today whether *Terry* stops to investigate all past crimes, however serious, are permitted."). As this court has done when considering previous departures from the general warrant requirement, *see supra* note 6, the answer to that question lies in balancing the respective public and private interests at stake.

The justifications supporting the present stop are made substantial by the nature of the misdemeanor offense at issue. Chong's

alleged contempt of court stemmed from his violation of numerous terms and conditions of a probationary sentence imposed for his conviction on five felony offenses. Strong societal interests in punishing those convicted of crime are well served by the prompt apprehension of persons who disrespect the constraints upon personal liberty attendant to their probationary release.[11] The public pursuit of rehabilitation is similarly advanced by re-sentencing a convict who has proven himself unresponsive to the less regimented mode of treatment that probation imposes. Finally, the collective desire to foster an environment of effective crime prevention favors retaking custody of a felon who—by breaching the terms of his probation—signals his possible return to criminal behavior.

On the other side of the scales lies the individual's entitlement to be free from the government intrusion foisted upon her person. Though the threat to personal security is not unsubstantial even in this instance,[12] a temporary stop to ascertain the identity of the targeted individual cannot be said to pose a more onerous encroachment than those stops that *Terry* and its progeny already sanction.

Thus, in contrast to the majority, I would hold that law enforcement commits no unconstitutional seizure if—when acting upon a valid arrest warrant for an alleged probation violator—officers briefly stop a moving vehicle to investigate their reasonable suspicion that the person named in the warrant is among its occupants.[13] As with other types

11. The deprivation of personal liberty accompanying a sentence of probation is inevitable, inasmuch as the conditions of probation require, *inter alia,* that the defendant: (1) "report to a probation officer;" (2) "remain within the jurisdiction of the court;" (3) "notify a probation officer prior to any change in address or employment;" and (4) "permit a probation officer to visit the defendant at the defendant's home or elsewhere." HRS § 706–624(1)(b), (c), (d), & (f) (1993). The sentencing court is of course free to impose more burdensome restrictions on the defendant. *Id.* § 706–624(2).

12. The private interests implicated by a vehicular stop to ascertain an obscured passenger's identity are no less significant than those infringed by other temporary vehicular detentions. In all cases, the targets of such a stop are doubtless subject to the "physical and psychological" in-

dignities and "unsettling show of authority" that accompany the non-consensual law enforcement seizure of a moving vehicle. *See Prouse,* 440 U.S. at 657, 99 S.Ct. at 1398; *see also* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.2(d), at 35 (3d ed. 1996) ("The typical stopping for investigation cannot be viewed as anything but a complete restriction on liberty of movement for a time[.]").

13. I disagree with the majority's contention that *State v. Colgrove,* 198 Neb. 319, 253 N.W.2d 20 (1977), supports a contrary position. *See* Majority at 181–82, 102 P.3d at 1081–82. *Colgrove* considered the propriety of a traffic stop to investigate law enforcement's suspicion that two women named in arrest warrants were in the defendant's vehicle. 253 N.W.2d at 22. At the suppression hearing, officers testified that they

of temporary investigative seizures, the standard of "reasonable suspicion" as applied to these circumstances appropriately balances the public interests in effecting the stop against the degree of personal liberty lost to the intrusion.[14]

### 2. Reasonable suspicion supported the investigative stop at its inception.

In considering a defendant's constitutional challenge of an investigative stop that is substantiated on the basis of "reasonable suspicion," this court follows the now-familiar

analysis most recently set forth in *State v. Prendergast:*

"To justify an investigative stop, short of an arrest based on probable cause, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Barnes,* 58 Haw. 333, 338, 568 P.2d 1207, 1211 (1977) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). To determine wheth-

---

cornered the defendant by parking their cars to the front and rear of his automobile. *Id.* They also admitted, however, that upon "stopp[ing] their own cars they became aware that there were three males in the [defendant's] car," and that the female fugitives "were not in the . . . vehicle." *Id.*

In light of those observations, the Nebraska supreme court reasoned that "[w]hen it became apparent that the persons for whom the officers were looking were not in the [defendant's] car[,] that vehicle should have been permitted to proceed." *Id.* at 23. That the officers continued to detain the men even after they had dispelled any suspicion that the fugitives were among those stopped made the intrusion unlawful in scope. *Id.*

Contrary to the majority's suggestion, *Colgrove* thus acknowledges an officer's authority to stop a vehicle to investigate his or her reasonable suspicion that a person named in a valid arrest warrant is among the vehicle's occupants. *Cf. id.* at 24 (Spencer, J., dissenting) ("[T]he sheriff's deputy . . . had a legitimate reason for making the stop," since "[h]e had been told that the persons for whom he had warrants were possibly in that car" and "[t]hat was his purpose for stopping it."). Indeed, had the *Colgrove* court reached a contrary conclusion, it would have simply held that the stop was unlawful at its inception.

**14.** The majority notes that Sergeant Poplardo testified at the suppression hearing that his " 'main' and 'initial' reason" for stopping Eleneki was to question her about Chong—a reason which the majority correctly concludes was unlawful. *See* Majority at 180–81, 102 P.3d at 1080–81.

I emphasize, however, that our reasonable suspicion analysis is an objective inquiry, the linchpin of which demands that the "events which occurred leading up to the stop" must arouse suspicion when viewed from the "standpoint of an objectively reasonable police officer." *See Ornelas v. United States,* 517. U.S. 690, 696, 116 S.Ct. 1657, 1661–1662, 134 L.Ed.2d 911 (1996). In assessing whether an officer's suspicion was objectively reasonable, the subjective motives, intentions, and proclivities of those actually on the scene play no role. *See, e.g., Bolton v. Taylor,*

367 F.3d 5, 7 (1st Cir.2004) ("Whether a reasonable suspicion exists is treated as an objective inquiry," such that "the actual motive or thought process of the officer is not plumbed."); *United States v. Holmes,* 385 F.3d 786, 790 (D.C.Cir. 2004) ("The propriety of a search under the Fourth Amendment depends on 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's own subjective intent in executing the search." (citation omitted)); *State v. Wallace,* 146 N.H. 146, 772 A.2d 892, 896 (2001) (noting that "defendant's contention that the officer must subjectively suspect the defendant of a crime is mistaken," since "[w]e have adopted an objective test for determining whether a specific and articulable basis for the requisite suspicion existed at the time of the stop"); *People v. Ramos,* 13 P.3d 295, 297 (Colo. 2000) (en banc) ("While the officer's subjective assessment of the facts may assist a court in arriving at an understanding of the situation confronting the officer at the time of the search, or may affect the officer's credibility, his or her subjective motives do not negate the propriety of an objectively reasonable search."); *State v. Heminover,* 619 N.W.2d 353, 361 (Iowa 2000) ("We . . . hold that in *Terry* stop cases the motivation of the officer stopping the vehicle is not controlling, and the officer is not bound by the real reasons for the stop."), *overruled in part not relevant, State v. Turner,* 630 N.W.2d 601, 606 n. 2 (Iowa 2001); *Commonwealth v. Smigliano,* 427 Mass. 490, 694 N.E.2d 341, 344 (1998) ("There is no merit to the contention that there was no basis for a *Terry* stop simply because the officer testified he did not suspect the defendant of any wrongdoing[.]"); *State v. Hawley,* 540 N.W.2d 390, 392 (N.D.1995) ("[T]he reasonable-and-articulable-suspicion standard is objective, and it does not hinge upon the subjective beliefs of the arresting officer."); *cf. Whren v. United States,* 517 U.S. 806, 812, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted the contrary.").

er the officer indeed had specific and articulable facts to justify the investigative stop, we examine the totality of the circumstances measured by an objective standard. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."); *Barnes,* 58 Haw. at 338, 568 P.2d at 1211 ("The ultimate test in these situations must be whether from these facts, measured by an objective standard, a man of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate.").

103 Hawai'i at 454, 83 P.3d at 717.

The United States Supreme Court has similarly defined "reasonable suspicion" in the following terms when assessing the constitutionality of an investigative traffic stop prompted by suspected criminal activity:

Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. *See, e.g., Brown v. Texas,* [443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979)]; *United States v. Brignoni–Ponce,* [422 U.S. at 884, 95 S.Ct. at 2581].

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio,* [ ] said that, "[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." [392 U.S. 1, 21 n. 18, 88 S.Ct. 1868, 1880 n. 18, 20 L.Ed.2d 889 (1968)] (emphasis added).

*United States v. Cortez,* 449 U.S. at 417–418, 101 S.Ct. at 695. In keeping with this approach, the Supreme Court has admonished that,

[i]n reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Illinois v. Wardlow,* 528 U.S. 119, 124–125, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000)

(citing *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695). Accordingly,

> [t]he principal components of a determination of reasonable suspicion ... will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion.... The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "The historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the relevant ... constitutional standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman–Standard v. Swint,* 456 U.S. 273, 289, n. 19, 102 S.Ct. 1781, 1791, n. 19, 72 L.Ed.2d 66 (1982).

*Ornelas v. United States,* 517 U.S. 690, 696–697, 116 S.Ct. 1657, 1661–1662, 134 L.Ed.2d 911 (1996) (brackets in original omitted).

Applying the foregoing principles, I concur with the State that the investigative stop was proper at its inception. According to the circuit court's findings of fact, Sergeants Poplardo and Navarro were attempting to locate Chong on the morning of Eleneki's stop for the purpose of arresting him on an outstanding arrest warrant. Sergeant Poplardo had arrested and interrogated Chong the previous day after a search of Chong's apartment uncovered crystal methamphetamine. The officer subsequently witnessed Eleneki use a white Chrysler PT Cruiser to drive Chong from the police station following his interrogation, and the next morning's chance encounter revealed Eleneki again behind the wheel of a white PT Cruiser, this time accompanied by two silhouetted passengers.

Though a close call, the "totality of the circumstances" as known to Sergeant Poplardo afforded the police objectively reasonable and particularized grounds to suspect that Chong was in Eleneki's company at the time her vehicle was stopped. *See Prendergast,* 103 Hawai'i at 453–454, 83 P.3d at 716–717. Of key importance, Chong's decision to summon Eleneki to the police station in the nighttime hours following his release no doubt signified a relationship of substance between the parties. Surely no reasonable person would expect that Eleneki—who had previously been indicted for promoting illegal narcotics [15]—would risk drawing attention in an area of certain police presence upon the call of a mere acquaintance, who himself had just been charged with similar drug offenses.

I therefore believe that an objectively reasonable police officer would suspect that, on the basis of their relationship, Chong and Eleneki might again be in each other's company on the morning after Chong's arrest. Certainly "the essence of good police work" requires that officers be reasonably free to act upon their "commonsense judgments and inferences about human behavior," *Wardlow,* 528 U.S. at 125, 120 S.Ct. at 676, and to employ within that calculus their special expertise concerning the patterns, practices, and habits typical of those who ply the illegal narcotics trade. *Cf. Arvizu,* 534 U.S. at 273, 122 S.Ct. at 750–751 (reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person' "); *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695 ("[T]he evidence ... collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."); *Brignoni–Ponce,* 422 U.S. at 885, 95 S.Ct. at 2582 ("In all situations the officer is entitled to assess the facts in light of his experience."). To demand a more probabilistic analysis would constrain police discretion to a degree that our Constitutions simply do not require.

## B. The Continued Detention was Unlawful

The lawfulness of the initial stop being no longer in issue, the question becomes whether continuing the stop was likewise reasonable. This court has consistently admonished police from "prolong[ing] the detention of individuals subjected to brief, temporary in-

**15.** *See State v. Eleneki,* 92 Hawai'i 562, 993 P.2d 1191 (2000).

vestigative stops ... once such stops have failed to substantiate the reasonable suspicion that initially justified them." *State v. Silva*, 91 Hawai'i 80, 81, 979 P.2d 1106, 1107 (1999); *see also State v. Kaluna*, 55 Haw. 361, 363, 520 P.2d 51, 55 (1974) (holding that a warrantless search must be "no broader than necessary to satisfy the need which legitimized departure from the warrant requirement in the first place"); *State v. Goudy*, 52 Haw. 497, 503, 479 P.2d 800, 804 (1971) ("[A]n investigative action which is reasonable at its inception may violate the constitutional protection against unreasonable searches and seizures by virtue of its intolerable intensity and scope.").

In the instant case, the circuit court found the following events to have transpired after Eleneki stopped her car:

15. Sergeant Poplardo approached DEFENDANT who was seated in the driver's seat, identified himself as a police officer, and asked her for her driver's license, which she provided. Defendant also told the officer that the car was a rental vehicle, and that she did not have insurance or a registration card;

16. Sergeant Poplardo then asked DEFENDANT what her passengers' names were, and she replied that she did not know the name of the male seated in the front seat, however, she identified the rear seat passenger as Charmaine Gabin;

17. That Sergeant Poplardo then asked DEFENDANT if she knew about the whereabouts of Scott Chong, and she claimed not to know him at all, contrary to what Sergeant Poplardo observed a day prior on April 30, 2001;

18. Sergeant Poplardo observed DEFENDANT to be nervous, fidgeted in her seat, would not look at Sergeant Poplardo, and mumbled when she spoke, and it appeared to Sergeant Poplardo as though

Defendant did not want to speak to him in the presence of her passengers[.]

The circuit court's findings of fact leave little doubt that by the time Sergeant Poplardo queried Eleneki about Chong, the officer had already determined that Chong was not among Eleneki's passengers. Reason and common sense dictate that Sergeant Poplardo—whose interrogation of Chong only the night before gave him personal knowledge of Chong's appearance—would have responded differently had he identified Chong on the scene.

The initial basis for Sergeant Poplardo's suspicion having thus been dispelled, the investigative stop could not lawfully have continued unless other specific and articulable facts, noticed in the interlude, furnished independent and reasonable grounds for reviving Sergeant Poplardo's suspicion that criminal activity was afoot. The circuit court's findings, however, are bereft of any alternative grounds to warrant Eleneki's continued detention. Specifically, the court identified no conduct by Eleneki or her passengers in the moments spanning the officers' foot-borne approach that afforded a basis for reasonable suspicion, nor was the stop's continuation predicated on observed violations of traffic ordinances or safety regulations. Rather, the record reveals that Sergeant Poplardo only became suspicious—and indeed only had a reasonable basis for suspecting criminal activity—upon his continued probing of Eleneki long after his right to detain her had dissipated.

Finally, I do not agree with the State's rather novel contention that an investigative stop is reasonable, so long as the individual targeted is viewed by law enforcement at the time of the stop as a potential source of information concerning a non-exigent collateral law enforcement matter.[16] The majori-

---

**16.** The State errs in relying on *State v. Joao*, 56 Haw. 216, 533 P.2d 270 (1975), for the proposition that such stops are reasonable. *Joao* involved law enforcement efforts to question defendant Joao about a traffic accident occurring nine days earlier, in which Joao was allegedly complicit. *Id.* at 217, 533 P.2d at 272. Examining the initial stop of Joao, this court held that the investigating officer's conduct "was proper" because the police "had a perfectly legitimate reason for

stopping the defendant in the first instance." *Id.* at 218, 533 P.2d at 272. That reason was simply to "afford the officer the opportunity to arrange for an interview with the defendant at a more reasonable hour and location," given that "the officer had been unable to [investigate his assigned traffic accident] because of his inability to locate the defendant earlier." *Id.*

*Joao* accordingly stands for the proposition that law enforcement may, under certain limited

ty's conclusion that a stop cannot be justified on that ground accords with the decisions of numerous other courts that have considered the issue. *See, e.g., United States v. Ward,* 488 F.2d 162, 169 (9th Cir.1973) (en banc) (traffic stop to question driver about fugitive acquaintance's location held unconstitutional where "[t]here was no emergency situation nor any need for immediate action," and "the stop was not made pursuant to the agent's founded suspicion that the detainee was involved or about to be involved in criminal activity" (emphasis omitted)); *State v. Richcreek,* 187 Ariz. 501, 930 P.2d 1304, 1306–1307 (1997) (traffic stop of defendant whom police believed "witness[ed] or knew something about" an earlier traffic accident held unconstitutional where "[t]here was no reason to believe [the defendant] was engaged in criminal activity"); *Hawkins v. United States,* 663 A.2d 1221, 1227 (D.C.1995) (traffic stop of victim for questioning about two-week-old shooting held unconstitutional where there were no " 'exigent circumstances' . . . to justify the officers' detention"); *People v. Spencer,* 84 N.Y.2d 749, 622 N.Y.S.2d 483, 646 N.E.2d 785, 789 (1995) (traffic "stop [of] defendant on the premise that he was a

possible or even probable source of information regarding [a] suspect's whereabouts . . . clearly do[es] not warrant a 'preventative governmental interest in the stop' and render[s] the police activity unreasonable" (citation and emphasis omitted)); *State v. Ryland,* 241 Neb. 74, 486 N.W.2d 210, 213 (1992) (traffic stop held unconstitutional where "deputy was not aware that [the defendant] had violated any rule of the road at the time he was stopped and . . . the deputy's sole purpose in stopping [the defendant] was to obtain his statement about a previous accident that [the defendant] had witnessed"); *State v. Colgrove,* 198 Neb. 319, 253 N.W.2d 20, 23 (1977) (holding that police unconstitutionally prolonged traffic stop of vehicle suspected of carrying fugitives "[w]hen it became apparent that the persons for whom the officers were looking were not in the [defendant's] car").[17]

circumstances, temporarily stop a moving automobile whose occupant has eluded police efforts to question him regarding criminal activities in which his involvement is suspected. That scenario is not at issue here, as Eleneki's detention was prolonged because of her potential knowledge concerning a wanted third party's location, and not because she was a criminal suspect herself. *Cf.* 4 LaFave, *supra* note 12, § 9.2(b), at 24 ("[W]hat little authority exists on the subject indicates that the Fourth Amendment does not permit the stopping of potential witnesses to the same extent as those suspected of crime.").

17. Though the result reached here might well have differed had exigent circumstances motivated Eleneki's stop, the circuit court's findings of fact make no mention of any such exigency with respect to locating Chong. Tellingly, the decision to release Chong immediately after his arrest and interrogation indicates that the police did not believe he posed either a danger to the public or a flight risk.