OPINION OF THE COURT
Ciparick, J.
The question presented is whether the police may stop a moving vehicle in order to request information of the driver concerning the whereabouts of a criminal suspect. We conclude that the stop in this case was an unreasonable seizure within the meaning of the Fourth Amendment.
I
On May 17, 1989, Police Officers Edward Alongé and Donald Conceicao were on routine patrol in a marked radio car when they received a radio report that a woman had been assaulted with a gun by her boyfriend the previous day. At 11:20 p.m., the officers picked up the complainant and, with her in the car, drove around the neighborhood searching for the suspect. According to the testimony of Officer Alongé, they drove around for "No more than four or five minutes” before the complainant saw defendant seated behind the wheel of a double-parked car and stated that he was a friend of her boyfriend’s and that the latter might be nearby. At this time, defendant’s vehicle began moving. The officers followed defendant and pulled him over using their turret lights and car horn. Defendant halted his vehicle on the next block and both officers approached the car carrying lighted flashlights. As the officers drew near they observed a female passenger. Upon shining their flashlights into the interior of the vehicle, the officers observed at the passenger’s feet a clear plastic bag containing green vegetable matter which they believed to be marihuana. The officers asked defendant and his passenger to exit the vehicle.
While defendant was outside the vehicle, Officer Alongé observed the butt of a revolver protruding from underneath the driver’s seat on the floor of the car. The officers determined that the gun was loaded and placed defendant under arrest. They permitted the passenger to leave the scene after defendant asserted she had nothing to do with the alleged marihuana. Defendant was charged with criminal possession of a weapon in the third degree and criminal possession of marihuana in the fourth degree.
*752 Defendant moved to suppress the physical evidence on the ground that its seizure violated his constitutional rights. The suppression court denied defendant’s motion, finding that the police officers in this case had a right to request information of defendant and could stop his car in order to effectuate that right. The court stated: "at the time the police resolved to exercise their right to request information, defendant’s vehicle was in motion. Under these circumstances, common sense demands that they be permitted to stop it.”
The Appellate Division affirmed, holding that the police acted reasonably in stopping defendant’s car to request information concerning a suspect’s whereabouts. The Court relied principally on People v John BB. (56 NY2d 482, cert denied 459 US 1010), in which we held that an automobile stop made pursuant to a uniform, nonarbitrary, roving roadblock was constitutionally permissible.
On this appeal, defendant argues that the Appellate Division erred in holding that the police could validly stop his vehicle in order to request information of him. We agree and therefore reverse.
II
Although the right to stop a vehicle is generally analogous to the right to stop a pedestrian, police/motorist encounters must be distinguished from police/pedestrian encounters when the police are operating on less than reasonable suspicion. This is because "the obvious impact of stopping the progress of an automobile is more intrusive than the minimal intrusion involved in stopping a pedestrian” and constitutes "at least a limited seizure subject to constitutional limitations” (People v John BB., 56 NY2d 482, 487, supra), whereas the common-law right of inquiry — much less the right to request information— does not include the right to unlawfully seize (see, People v Sobotker, 43 NY2d 559, 563; People v Ingle, 36 NY2d 413, 418).
We have stated, time and again, that the stop of an automobile is a seizure implicating constitutional limitations (People v May, 81 NY2d 725; Sobotker, 43 NY2d 559, supra; Ingle, 36 NY2d 413, supra; see, Delaware v Prouse, 440 US 648, 653 ["stopping an automobile and detaining its occupants constitute a 'seizure’ within the meaning of (the Fourth Amendment), even though the purpose of the stop is limited and the resulting detention quite brief’]). Contrary to the urging of the dissent that we allow preventative "informational stops” *753 so long as some articulable basis exists for that interference, police stops of automobiles in this State are legal only pursuant to routine, nonpretextual traffic checks to enforce traffic regulations or when there exists at least a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime (see, People v Harrison, 57 NY2d 470, 476 [an automobile stop is "a limited seizure of the person which at least requires reasonable suspicion”]; Sobotker, 43 NY2d, at 563; Ingle, 36 NY2d, at 417-420).
We reaffirmed these principles recently in People v May (81 NY2d 725, supra), where the defendant and a female companion were sitting in a parked car on a deserted street known for criminal activity. When two police officers in a patrol car approached with red turret lights and a spotlight, defendant started his car and slowly pulled away. Defendant was ordered to pull over. We held that the police officers’ premise for that order — the common-law right of inquiry — did not satisfy Fourth Amendment standards: "the stop was proper only if the officers had a reasonable suspicion of criminal activity” (id., at 727).
Of course, nothing prevented the police in May from making a common-law inquiry of the individuals in the vehicle while they were still parked, based on the second level "founded suspicion that criminal activity is afoot”, which permits interference "with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure” (People v De Bour, 40 NY2d 210, 223). But we have made clear that the right to stop a moving vehicle is distinct from the right to approach the occupants of a parked vehicle (see, Harrison, 57 NY2d 470, supra [police needed only articulable basis to approach parked car and request information but, absent reasonable suspicion, officers could not forcibly detain or constructively stop defendants by ordering them to remain in car]). Thus, once the defendant in May indicated his unwillingness to speak to the officers by pulling away, they should not have forced him to stop absent a reasonable suspicion of criminal activity (May, 81 NY2d, at 728). "Any other rule”, we stated, "would permit police seizures solely if circumstances existed presenting a potential for danger” (id., at 728).
Clearly, as in cases involving the forcible detention of pedestrians, the instant stop of defendant was a seizure. At the moment defendant was pulled over the encounter lost the *754 consensual characteristics which mark permissible first level intrusions under the De Bour four-part test (see, People v De Bour, 40 NY2d 210, supra). The question we must address in this case is whether that seizure was reasonable.
Ill
The reasonableness of a seizure must be judged "by balancing its intrusion on the Fourth Amendment interests of the individual involved against its promotion of legitimate governmental interests” (People v Scott, 63 NY2d 518, 525; People v John BB., supra; Delaware v Prouse, supra). Important factors in that balancing analysis are the effectiveness of the procedure in relation to the governmental interest to be promoted, and "the degree of intrusion of the procedure on the individual subjected to it, measured in terms of both its subjective effect and the degree of discretion vested in the officials charged with carrying it out” (Scott, 63 NY2d, at 525, supra).
Applying this balancing analysis to the instant case, we conclude that the nature and degree of the police intrusion outweighed the governmental interest at issue. It is not enough, contrary to the dissent’s view, that articulable governmental interests supported the stop. While the nature and degree of the governmental interest at issue here — investigation and detection of past criminal conduct — is undoubtedly significant, it does not implicate the same important social objectives that are at issue when police are investigating recent or ongoing suspected criminal activity (see, United States v Hensley, 469 US 221, 228).
In United States v Hensley (469 US 221, supra), the Supreme Court upheld the Terry stop of an individual based on a "wanted flyer” indicating that the defendant was a suspect in a past robbery. Nevertheless, the Court addressed the nature of the governmental interest implicated by the investigation of past criminal activity and made an important distinction that is relevant here:
"The factors in the balance may be somewhat different when a stop to investigate past criminal activity is involved rather than a stop to investigate ongoing criminal conduct. This is because the governmental interests and the nature of the intrusions involved in the two situations may differ. As we noted in Terry, one general interest present in the context of ongoing or imminent criminal *755 activity is 'that of effective crime prevention and detection.’ * * * A stop to investigate an already completed crime does not necessarily promote the interest of crime prevention as directly as a stop to investigate suspected ongoing criminal activity. Similarly, the exigent circumstances which require a police officer to step in before a crime is committed or completed are not necessarily as pressing long afterwards. Public safety may be less threatened by a suspect in a past crime who now appears to be going about his lawful business than it is by a suspect who is currently in the process of violating the law. Finally, officers making a stop to investigate past crimes may have a wider range of opportunity to choose the time and circumstances of the stop.” (469 US, at 228-229.)
Not only is the dissent unwilling to acknowledge that stopping an automobile for the purpose of determining whether its occupants can provide information implicating others in past criminal activity involves a less substantial governmental interest than is at issue when the police are involved in actual crime prevention, it blurs the distinction between current or imminent, and past criminal activity.
The dissent’s efforts at highlighting the urgency of gathering fresh information on the violent felon’s then whereabouts and the prevention of further violence (see, dissenting opn, at 762) are belied by the record. The record is absolutely devoid of any evidence justifying the inference that the complainant, or anyone else for that matter, was in danger of further harm from the suspect. There is similarly no indication that the complainant had ever been assaulted by the suspect before this incident. Nor is there any evidence to support the inference that the suspect was "armed and dangerous” 43 hours later.
The circumstances of this case — including the 43-hour time lapse between the alleged assault and defendant’s stop, and the fact that the officers had not even searched for the suspect at his own home when they decided to stop defendant on the premise that he was a possible or even probable source of information regarding the suspect’s whereabouts — clearly do not warrant a "preventative governmental interest in the stop” (see, dissenting opn, at 762) and render the police activity unreasonable.
*756 Beyond the fact that the police were investigating past criminal conduct here, the dissent also fails to appreciate that "the Fourth Amendment does not permit the stopping of potential witnesses to the same extent as those suspected of crime” (3 LaFave, Search and Seizure § 9.2 [b], at 354 [2d ed]). In United States v Ward (488 F2d 162), FBI agents, using sirens, pulled the defendant over in order to question him privately concerning some Federal fugitives. The court held that the seizure, which resulted in the agents’ recovering a false selective service registration card from the defendant, was unreasonable:
"First, there was no crime 'afoot.’ The FBI agents did not stop appellant’s car in connection with any particular crime, but rather the stop was pursuant to a general criminal investigation that had begun several months before. There was no emergency situation nor any need for immediate action. The FBI was not fearful that the appellant would leave town. The agents never sought an interview with the appellant at either his home or place of business although both could have been arranged. In short, there were no exigent circumstances warranting the extreme nature of a vehicular stop by a siren on a public street. * * *
"Finally, and most significantly, the stop was not made pursuant to the agent’s founded suspicion that the detainee was involved or about to be involved in criminal activity. Rather, the stop was made for the purpose of questioning the appellant about a third person. This then was not a '. . . brief stop of a suspicious individual [made] in order to determine his identity or to maintain the status quo momentarily . . .’ Adams v. Williams, 407 U.S. 143, 146 * * * (emphasis added), for the appellant was not the object of the FBI’s suspicions. Clearly, the narrow exception of Terry v. Ohio * * * which allows investigative stops on grounds short of probable cause cannot be stretched so far as to allow detentive stops for generalized criminal inquiries” (Ward, 488 F2d, at 169-170).
Crucial to the holding in Ward, and here also, is the absence of a crime "afoot.” Similarly, there is no indication here that *757 the officers reasonably believed the suspect was about to disappear, thus permitting them to briefly stop defendant in order to "freeze” an ongoing or dangerous situation and acquire more information in contemplation of further action. The record is devoid of any indication that the suspect presented an imminent threat to public safety. Moreover, it should be noted that when defendant was pulled over, the officers had been circling the same neighborhood for only 4 or 5 minutes, obviously expecting to find the suspect in the same vicinity where the complainant had recently observed him; nevertheless, the officers stopped defendant, because, in Officer Alonge’s words, "he might possibly know” the suspect’s whereabouts, even though they had not even looked in the same "Jerk Chicken” restaurant where the complainant had actually and recently spotted the suspect.
In short, under the circumstances of this case, there was no genuine need for so immediate and intrusive an action as pulling over defendant’s freely moving vehicle. When the governmental interest in finding and apprehending the suspect in this case is considered in relation to the effectiveness of the procedures chosen to promote it, the intrusiveness of pulling over defendant’s freely moving vehicle cannot be justified (see, Scott, 63 NY2d, at 525, supra). Considered objectively, the law enforcement benefits that would accrue to the government on these facts by stopping an individual vehicle on the ground that its occupants might know the whereabouts of an individual suspected of past criminal activity are marginal. Indeed, less intrusive alternatives could have been employed here.
"[T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society’s legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers” (Brown v Texas, 443 US 47, 51; see, Scott, 63 NY2d, at 525, supra). We need not and do not hold today that police officers may never stop a vehicle in order to request information of its occupants. We merely hold that the specific, objective facts of this case did not justify defendant’s seizure. The governmental interest at issue in this case must be considered in context. This case involved: the investigation of past criminal activity; the stop of a third person not suspected of criminal activity; the absence of exigent circumstances justifying immediate police action; the availability of *758 less intrusive alternatives; and, the candid testimony of the officers, who considered defendant no more than a possible source of information.
IV
Quite apart from the question of intrusion, the instant seizure is also unreasonable when measured in terms of the degree of discretion vested in the officials charged with carrying it out (see, Scott, 63 NY2d, at 525, supra). The act of forcibly pulling defendant over resulted from the unchecked discretion of the particular officers involved. It must be kept in mind that this defendant was not the subject of individualized suspicion. In the absence thereof, other safeguards are necessary to ensure that his reasonable expectation of privacy is not subject solely to the discretion of the police. In this case, there were no objective safeguards circumscribing the exercise of police discretion. The stop of defendant was standardless and unconstrained. Nor can we accept the People’s urging that the police officers acted in good faith. Subjective good faith, standing alone, is not enough.
Our decision in People v John BB. (56 NY2d 482, supra), also involving a suspicionless stop, does not support a contrary result, because other safeguards were present in that case. We held in John BB. that the Fourth Amendment does not prohibit the police from employing a roving roadblock in a sparsely populated area beset by burglaries where vehicles are stopped pursuant to a "nonarbitrary, nondiscriminatory and uniform procedure” for the purpose of ascertaining the identity of the occupants and obtaining information concerning criminal activity in the area (id,., at 488).
There are two crucial distinctions between John BB. and the instant case. First, the level of intrusion on the motorists’ Fourth Amendment rights in John BB. was arguably minimal given that all motorists were being stopped in an impersonal, random manner and no individual vehicle was singled out. The second vital distinction, also arising from the nature of the procedure utilized, was the elimination of "the element of arbitrariness”, which we noted had been identified "time and again as a critical factor in determining the reasonableness of official investigative activity of an intrusive nature” (id., at 488). The nonarbitrary, systematic stopping of vehicles in John BB. insured that the procedures employed by the police did not unfold in a manner resting solely upon the officers’ discretion.
*759 Unlike John BB., this case evidences a complete lack of objective standards circumscribing the exercise of discretion by the individual officers involved in making the stop. Clearly, John BB. was improperly relied upon by the Court below.
"The exclusionary rule has as an objective the social benefit of deterring unlawful police conduct.” (People v Wesley, 73 NY2d 351, 354.) The rule’s contours are based in a social policy judgment which "necessarily entails balancing the cost of the loss of probative evidence against the gain in deterring lawless police conduct.” (Id., at 355.) In the circumstances of this case, when the foreseeable deterrent effect against unlawful police conduct is fairly balanced against the adverse impact of suppression upon the truth-finding process, the scale tips decidedly in favor of suppression. If the instant stop were permissible and motorists could in fact be pulled over at an individual police officer’s discretion based upon the mere right to request information, a pandora’s box of pretextual police stops would be opened.
Finally, we fail to discern the logic underlying the Appellate Division’s conclusion that "[t]here is a marked and critical distinction between this case and those in which the person whose vehicle is stopped is the target of the investigative questioning” (193 AD2d 90, 96). It would be quite an anomalous rule of law if the free movement of persons who are the targets of investigative questioning could not be interrupted without reasonable suspicion (see, Sobotker, 43 NY2d, at 563-564; Ingle, 36 NY2d, at 418), but ostensibly law-abiding citizens under no suspicion could be pulled over any time the police had reason to believe they might have information relevant to a past crime. The Fourth Amendment does not require such convoluted jurisprudence.
Accordingly, the order of the Appellate Division should be reversed, defendant’s motion to suppress the physical evidence granted, and the indictment dismissed.