OPINION OF THE COURT
Patrick J. McGrath, J.
Defendant has moved to suppress physical evidence seized from his person. After conducting a hearing to determine the defendant’s motion the court makes the following findings of fact and conclusions of law:
FINDINGS OF FACTS
Captain Robert Cipperly from the Troy Police Department served as the midnight platoon commander for the Troy Police Department from late 1995 through 1997. He was responsible for all police units working within the City of Troy during the midnight shift. When Captain Cipperly first began as midnight platoon commander he was concerned with reoccurring criminal conduct within the central business district of the City of Troy. The criminal activity included purse snatchings, robberies, assaults, and personal injury to pedestrians on the sidewalk. Most of the above criminal activity was facilitated by the use of bicycles. The perpetrators either arrived at the scene or left the scene of the crime by the use of a bicycle. As a result, Captain Cipperly undertook a research project to find out what laws were, available in order to attempt to curb the facilitation of these types of crimes with bicycles. Captain Cipperly determined that there were existing laws under the Vehicle and Traffic Law as well as the Troy City Code regarding the operation of bicycles and the required equipment. Captain Cip-perly decided to enforce the existing laws in relation to bicycles in order to help curb the criminal conduct that had become a problem in the central business district. In the latter part of 1995 Captain Cipperly informed all officers under his command on the midnight platoon to start enforcing the laws in *818 connection with the operation of bicycles and required equipment. All individuals charged were to be arrested and brought to the police station for completion of a long-form information. If the individuals could be positively identified then an appearance ticket would be issued at the police station and they would be released. Otherwise, bail would be set and the individuals would remain in custody unless they were able to post bail.
Captain Cipperly informed the midnight officers to enforce the bicycle laws uniformly against all individuals found to be in violation and did not target any specific group. Once the new enforcement policy was in place, Captain Cipperly became aware of the fact that additional criminal activity, specifically drug activity, was also being facilitated by the use of bicycles.
After a period of time, the criminal activity that had been a problem on the midnight shift in relation to bicycles was also becoming a problem on the other two shifts of days and afternoons. Captain Cipperly then informed the other platoon commanders of the initiative he had taken in aggressively enforcing the existing laws in connection with the operation of bicycles and required equipment in order to help curb the criminal activity. The aggressive enforcement policy was then extended to the other shifts. Also, the area of enforcement was expanded north of the central business district to include zone three, which was the highest crime area within the City of Troy. The City of Troy had received a Federal grant entitled “Community Organized Municipally Based Anti-crime Teams” for zone three in order to help curb crime in the area and bring the streets back to vehicular and pedestrian traffic where residents can freely conduct personal and business activities in a safe neighborhood. Once Captain Cipperly’s policy was enforced by all shifts the policy was referred to as the enforcement of quality of life crimes. In addition to bicycles it included such other offenses as littering, jaywalking, and prostitution.
The aggressive enforcement policy mainly applied to the central business district and zone three and was not deployed in the other zones of the city. The street officers did have discretion to issue appearance tickets at the scene and not bring the individual to the police station. The standard policy of the Troy Police Department is to search all individuals who are arrested and brought to the police station. If they are being placed in a holding cell, or if it is deemed necessary in the arresting officer’s opinion, a visual strip search will be conducted of the prisoner.
On September 27, 1998, Officer Richard Schoonmaker from the Troy Police Department was working the day shift in zone *819 three of the City of Troy. He was in a marked police unit and working with Officer Richard Gorleski. Officer Schoonmaker was Officer Gorleski’s field training officer. At approximately 3:15 p.m. while on patrol in zone three going south on Sixth Avenue Officer Schoonmaker observed the defendant operating a bicycle on the wrong side of the road, going north on Sixth Avenue in the southbound lane of traffic. The defendant was operating a blue bike with no bell on it in violation of the Vehicle and Traffic Law and Troy City Code. The defendant was not seen violating any other laws. Officer Schoonmaker turned the police vehicle around and drove alongside the defendant in the southbound lane of Sixth Avenue while proceeding in a northerly direction. Officer Schoonmaker requested the defendant to pull over and stop. The defendant initially failed to do so until Officer Schoonmaker repeated his request two to three more times. It was Officer Schoonmaker’s intention to issue the defendant a Vehicle and Traffic Law ticket for no bell on the bike and check the defendant for identification. If the defendant had proper identification and complied with Officer Schoonmaker it was his intention to issue the defendant a ticket and release him at the scene.
Finally, the defendant did stop his bicycle alongside the curb. Officer Schoonmaker pulled his car to within two or three feet of the defendant and radioed another unit for backup. Officer Schoonmaker exited his vehicle and requested identification from the defendant. At that time, Officer Schoonmaker did not recognize the defendant. The defendant responded “You know me, Under.” Officer Schoonmaker then recognized the defendant from other encounters he had had with him in the past. Officer Schoonmaker believed that the defendant was a suspect in a murder case and a known drug dealer in the City of Troy. “Under” was the defendant’s street name. Defendant gave valid identification to Officer Schoonmaker. Officer Schoonmaker read the identification to Officer Gorleski who did a file check for any possible warrants. The file check was negative. Officer Schoonmaker then advised the defendant he was operating a bike without a bell and was requested to step off the bike. It was Officer Schoonmaker’s normal practice to ask the individual to step off the bike so that a uniform traffic ticket could be issued to the individual. Approximately two minutes transpired between Officer Schoonmaker stopping the defendant and requesting him to get off his bicycle. Defendant responded “No bell on a bike? This is bullshit” and refused to get off the bike. Defendant was again asked to get off his bike two more times *820 by Officer Schoonmaker and he still refused. Officer Schoon-maker then grabbed the handlebars of the bike for officer safety. Officer Schoonmaker had received training that bicycle handlebars could be altered as a weapon. Once Officer Schoon-maker placed his hand on the handlebars, the defendant slapped the officer’s hand pushing it off the handlebars. Officer Schoonmaker then informed the defendant he was under arrest and tried to grab him around the waist. The defendant threw the bike to the ground and began struggling with Officer Schoonmaker. The defendant was attempting to move away from Officer Schoonmaker towards the other officers. Officers Ryan and Hughes had arrived in a separate police vehicle as requested backup.
The defendant did not believe the police had the right to stop him and was very upset about the procedure. The defendant did not want the police officers to search him and tried to stop any search. The defendant struggled with the police officers and refused to be handcuffed. Eventually the defendant was handcuffed, arrested, and brought back to the police station. He was charged with harassment, resisting arrest, and felony drug possession (a search of the defendant incident to his arrest revealed drugs on his person).
Officer Schoonmaker had made several hundred stops for people committing bike violations such as no bell on the bike, no light on the bike, riding on the sidewalk, or no helmet. He had stopped men, women and children of all races. It was Officer Schoonmaker’s common practice to stop all individuals in violation of the laws concerning the operation and necessary equipment of bicycles. When children are stopped they are given a discount coupon for purchase of a helmet. It was Officer Schoonmaker’s normal practice to request all individuals to get off the bike once the person was stopped for a bicycle violation.
The Troy Police Department is still aggressively enforcing the bike violations in the central business district and zone three of the City of Troy as attested to by eight separate individuals called by the defense. These eight individuals were stopped by the Troy Police Department between November of 1998 and August of 1999 for bike violations. Each individual did in fact operate a bicycle without proper equipment of either a bell, light, or helmet. Four out of the eight individuals involved Officer Schoonmaker. Each individual was brought to the Troy Police Station and either given an appearance ticket, posted bail, or were held for arraignment by the Judge. A vis *821 ual strip search was conducted of five out of the eight individuals. Two of the individuals received a pat-down search while one of the individúals was not searched at all at the police station.
CONCLUSIONS OF LAW
The defendant’s first basis for suppression is that the stop of the defendant was part of a policy of pretextual stops which violates the New York State Constitution’s bar against unreasonable searches and seizures. Police stops of automobiles in this State are legal only pursuant to routine, nonpretextual traffic checks to enforce traffic regulations or when there exists at least a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing or are about to commit a crime (People v Harrison, 57 NY2d 470, 476). This court believes that the same constitutional rules and rationale applicable to police/motorist encounters should be applied to the facts of this case involving police/bicyclists encounters. Accordingly, the stop of the defendant on his bicycle is a seizure implicating constitutional limitations (People v Spencer, 84 NY2d 749, 752).
In 1996 the United States Supreme Court ruled that a credible, objective traffic infraction foreclosed examination of the actual motivations of the individual officers who made the stop because “[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis” (Whren v United States, 517 US 806, 813). However, post -Whren rulings by New York courts have continued to apply the primary motivation test, and have done so without any attempt to analyze or distinguish Whren and, indeed, without reference to it. (See, e.g., People v Califano, 255 AD2d 701 [3d Dept 1998]; People v Grow, 249 AD2d 686 [3d Dept 1998]; People v Peterson, 245 AD2d 815 [3d Dept 1997]; People v Young, 241 AD2d 690 [3d Dept 1997]; People v Tillie, 239 AD2d 670, 672 [3d Dept 1997]; People v Lamb, 235 AD2d 829 [3d Dept 1997].) Accordingly, this court must look to the primary motivation of the police policy as well as the actions of the police on September 27, 1998.
Turning first to the policy itself. The defense argues that since the purpose of the policy was to deter criminal activity conducted on bicycles it is pretextual and constitutionally impermissible. Actions by the police to deter or investigate criminal activity made pursuant to a nonarbitrary, nondiscriminatory and uniform procedure are not constitutionally imper *822 missible (see, People v John BB., 56 NY2d 482 [where the Court of Appeals upheld the stopping of all vehicles in a nonarbitrary, uniform procedure located in a heavily burglarized area in order to facilitate the legitimate function of acquiring information regarding the recent rash of burglaries]). The facts of each case must be examined and the essential inquiry is whether the police conduct may be characterized as reasonable, which in turn requires a balancing of the State’s interest in the inquiry at issue against the individual’s interest in being free from governmental interference (Delaware v Prouse, 440 US 648; People v De Bour, 40 NY2d 210). Neither the Federal nor State Constitution precludes reasonable police measures to fight crime. It is only those measures that are carried out in an arbitrary manner or with a purposeful discriminatory intent that are precluded by the Constitution. The burden is upon the defendant to prove unconstitutionality (McCleskey v Kemp, 481 US 279). For the reasons set forth below this court finds that the defendant has not met his burden.
It was unrefuted that the Troy policy was and is carried out in a uniform and nondiscriminatory manner: every man, woman, or child of all races was to be stopped for bicycle violations under the policy. Also, the purpose of the policy was to curb and deter increased criminal activity in designated areas. Faced with such increased criminal activity, what are the police to do? Ignore it and do nothing, or take reasonable steps to enforce existing laws that could help curb the criminal activity. Certainly, the latter is the more reasonable, if not the only reasonable, action to be taken.
Defendant has failed to show any purposeful discriminatory intent in connection with the police policy. Accordingly, the policy itself is a proper exercise of the State’s interest in protecting the public from criminal activity. The State interest of making the streets safe for its citizens outweighs the intrusion to the individual.
Turning next to the specific actions of the police on September 27, 1998. The primary motivation for defendant’s stop was his operation of a bicycle without a bell in violation of both the Vehicle and Traffic Law and the Troy City Code. Since it was Officer Schoonmaker’s usual practice to stop all bicyclists without proper equipment, there is a sufficient evidentiary basis for the conclusion that the bicycle violation provided the primary motivation for the stop (People v Grow, supra, at 687). It was not until the defendant’s actual stop and seizure for said violation that the police officer realized the defendant was *823 suspected, of prior criminal activity. The stop of the defendant was clearly justified and the mere fact that the officer, subsequent to the stop, was aware that defendant was suspected of drug trafficking and other criminal activity did not affect the legality of the officer’s conduct (People v Ross, 228 AD2d 718 [3d Dept 1996], lv denied 88 NY2d 993; People v Coggins, 175 AD2d 924, 926). As the initial stop was justified, the relevant inquiry is whether the limited seizure effected by the stop was reasonably related in scope to the circumstances which justified the detention in the first instance (see, People v Banks, 85 NY2d 558, 562, cert denied 516 US 868).
The seizure was short in duration, approximately two to three minutes in order to determine the defendant’s identity and issue a uniform traffic ticket. The circumstances of the seizure were not unreasonable. Requesting the defendant to get off the bike was of a minimal intrusion related to the common practice of the officer in issuing uniform traffic tickets. Accordingly, the initial justification for seizing and detaining the defendant was not exhausted up until the point that the defendant slapped Officer Schoonmaker’s hand, thereby providing reasonable cause to arrest the defendant for harassment (CPL 140.10 [1] [a]). Therefore, the police actions were reasonable and not in violation of the New York State or Federal Constitution’s bar against unreasonable searches and seizures. Defendant’s motion to suppress physical evidence is denied.