RIVERA, J. (dissenting).
On this appeal, we must determine whether further police action during an encounter with an individual in a residential building is justified where the individual fails to respond to police questions and merely stands motionless ***967 and silent. The majority's conclusion that the record supports defendant's forcible detention and frisk is inconsistent with our established law. Absent reasonable suspicion that a person has committed, is committing, or is about to commit a crime, the police may not stop and detain them (see People v. Moore, 6 N.Y.3d 496, 814 N.Y.S.2d 567, 847 N.E.2d 1141 [2006] ; People v. De Bour, 40 N.Y.2d 210, 386 N.Y.S.2d 375, 352 N.E.2d 562 [1976] ). Reasonable suspicion cannot be based on a person's failure to answer police questions absent other indicia of criminal activity. Nor may forcible police action be based on a person's efforts to avoid confrontation, which defendant clearly sought to do here by turning around and facing the wall.
The case before us is particularly startling because the police approached defendant to ascertain whether he lived in the building, which he in fact did. He chose not to tell that to the police when asked-a choice the law protects. In my view, nothing about defendant's encounter with the police supports the erosion of his "right to be let alone" (see People v. Howard, 50 N.Y.2d 583, 590, 430 N.Y.S.2d 578, 408 N.E.2d 908 [1980] ). Accordingly, I would reverse and grant defendant's motion to suppress.
I.
The People's sole witness at the suppression hearing, Officer Rodriguez, described *775 how he and three other police officers encountered defendant in a New York City Housing Authority (NYCHA) residential apartment building[1] during their "vertical patrol": a procedure by which the police "check the whole building from the roof top to the first floor to see if there's any loitering-basically any violations." The officers first spotted defendant, wearing a T-shirt over a hoodie, riding in an elevator that had just stopped on the seventh floor. After the other passengers exited the elevator, defendant took a step out, then, according to Officer Rodriguez, stepped back inside when the officer looked at him. The police were dressed in plainclothes, with their badges exposed. Officer Rodriguez called out to defendant, "Can you hold the door, police, hold the door?" Officer Rodriguez observed defendant continuing to press a button and the elevator doors closed. He explained that the officers then ***968 decided to pursue defendant "because he wanted to come out, had the hoodie up and there's a lot of stuff going on, so I just wanted to make sure he lived in the building because usually there's a lot of narcotic traffic in the buildings. So just, you know, to verify that he was supposed to be there." Officer Rodriguez did not explain what he meant by "a lot of stuff going on" or why the officers assumed defendant might not be a tenant. On cross examination, the officer confirmed that the police had no information that defendant was involved in criminal activity or was a suspect in any police investigation occurring within the NYCHA building.
The officers followed the elevator, climbing to the eighth and then ninth floor, where they saw defendant in the hallway. During direct examination by the Assistant District Attorney, Officer Rodriguez described the interactions that eventually led to defendant's arrest:
"[ADA:] Now, when you got up to the ninth floor, what did you see?
"[Officer Rodriguez:] Well, I saw him, he was in the hallway. I identified myself again. I asked him, 'Do you live in the building?' He didn't say anything. He turned and faced the wall. He had his head down with his hoodie. I asked him, 'Do you live in the building?' He wouldn't say anything. Then I noticed there was a bulge in his right arm. I asked him, 'Do you have any weapons?' He didn't say anything again. Once I saw the bulge I grabbed his wrist area and I felt the machete. I pulled up his sleeve, you know, just to see the tip of the machete, and definitely I was like, 'drop it, drop it.' He wouldn't drop it.
"[ADA:] Let me stop you right there. Just before you grabbed the bulge, did you say anything else to him?
"[Officer Rodriguez:] I asked him, does he live in the building. He didn't say anything. And then I asked him, does he have any weapons. This is simultaneously as I'm looking at the bulge.
"[ADA:] Let me ask you: When you-after you asked him did he have any weapons, were you able to see his hands?
***969 "[Officer Rodriguez:] No, sir.
"[ADA:] Did you ask him anything with respect to that?
"[Officer Rodriguez:] Before that, before I touched him I said, 'Let me see your hands,' and he did not show me his hands.
*776 "[ADA:] Where were his hands?
"[Officer Rodriguez:] They were inside his sleeve.
"[ADA:] Now, at what point when you got upstairs did you notice the bulge, if at all?
"[Officer Rodriguez:] When I approached him, identified myself. I usually like looking at people. And I noticed-I like to talk to people and have them thinking something else, because I saw the bulge, I knew there was something there because I asked him, 'Do you have any weapons?' And he refused to tell me anything. Plus he didn't show me his hands after I asked him to show me his hands.
"[ADA:] Now, how was he holding-first of all-beg your pardon-which arm, left or right, did you see the bulge in?
"[Officer Rodriguez:] Right arm.
"[ADA:] And how was he holding his right arm?
"[Officer Rodriguez:] It was stiff and I couldn't see his hand.
"[ADA:] When you say 'stiff,' do you mean like straight out?
"[Officer Rodriguez:] Straight out.
"The Court[:] It wasn't like normally the way you stand with the arm a little bent?
"Are you saying his arms were at an angle to his body?
"[Officer Rodriguez:] No, straight down."
On cross examination Officer Rodriguez further explained why he grabbed defendant:
"[Officer Rodriguez:] ... After that I asked him, ***970 let me see your hands, because they were covered. I asked him several times, he didn't do it. At that point I decided, let me feel his arm, his wrist area. That's when I felt the blade, metal object.
"[Defense Counsel:] You did that because it was so visible even underneath the clothing?
"[Officer Rodriguez:] I did it because he didn't want to show me his hands.
"[Defense Counsel:] Is it your testimony that despite the fact that he wasn't showing you his hands, you nonetheless saw a bulge in his arm?
"[Officer Rodriguez:] Yes, plus he didn't-it added on. Once he didn't show me his hands, then I had to see what was there, sir, for my safety.
"[Defense Counsel:] And is it then that you essentially conducted a body frisk of him?
"[Officer Rodriguez:] No, I just went to that area, felt it, pulled his sleeve back-I knew it was an object, I knew it was metal. Pulled it back and that's when I saw the tip.
"[Defense Counsel:] Because the sleeve on one arm did not resemble the other arm?
"[Officer Rodriguez:] Thickness."
Officer Rodriguez immediately placed defendant in custody. The officer soon discovered that defendant lived in the building with his mother, on that same floor, approximately three doors away from where he was arrested.
Defendant moved to suppress the fruits of Officer Rodriguez's search, namely the weapon and some money, on the grounds that the officer improperly stopped and grabbed him in the hallway. The court denied the motion. Defendant was subsequently convicted of robbery in the first degree and sentenced as a second felony offender to a term of 15 years.
The Appellate Division affirmed the conviction and sentence in a 3-2 decision, and, as relevant to this appeal, concluded that the police had a credible reason to follow defendant and that the police intrusion was *777 justified ( People v. Perez, 142 A.D.3d 410, 416, 37 N.Y.S.3d 243 [1st Dept. 2016] ). The dissent argued that "from the inception of his encounter with the police, defendant's conduct was consistent with his constitutional right to avoid contact ***971 with the police" and the "detention and frisk of defendant by grabbing his wrists, pulling up his sleeves, and removing a weapon from his body was not justified" ( id. at 417-418, 37 N.Y.S.3d 243 [Gische and Manzanet-Daniels, JJ dissenting] ). One of the dissenting justices granted defendant leave to appeal.[2]
II.
As a threshold matter, contrary to the majority's conclusion, this appeal does not present a mixed question of law and fact, as we are not called upon to resolve matters in which "facts are disputed, where credibility is at issue or where reasonable minds may differ as to the inference to be drawn from the established facts" (see People v. McRay, 51 N.Y.2d 594, 601, 435 N.Y.S.2d 679, 416 N.E.2d 1015 [1980] [citation omitted] ). Instead, "a question of law is presented for review" as to whether the evidence the People presented amounts to the "minimum showing necessary" to warrant the law enforcement action that occurred ( id. ). As we have recognized in the past, articulating the law and ensuring that the challenged police intrusion is justified is within our constitutionally-derived power (see NY Const, art VI; People v. Spencer, 84 N.Y.2d 749, 622 N.Y.S.2d 483, 646 N.E.2d 785 [1995] ; People v. May, 81 N.Y.2d 725, 593 N.Y.S.2d 760, 609 N.E.2d 113 [1992] ; see also People v. Hicks, 68 N.Y.2d 234, 238, 508 N.Y.S.2d 163, 500 N.E.2d 861 [1986] ["Defendant's assertion ... that the only basis for the stop was that the men in the car were black in a white neighborhood presents an issue of sufficiency and thus raises a question of law"]; People v. Bigelow, 66 N.Y.2d 417, 420-421, 497 N.Y.S.2d 630, 488 N.E.2d 451 [1985] ["[w]hen the issue is the minimum showing necessary to establish probable cause, however, a question of law is presented for our review"]; Arthur Karger, Powers of the New York Court of Appeals § 21:6 at 754-762 [3d ed rev 2005] ).
We must be especially careful not to minimize our role in setting forth the proper legal standards in cases challenging the propriety of police encounters with the public, as "[w]e [have] singled out the area of crime prevention for special mention, noting that '[s]ince this function is highly susceptible to subconstitutional abuses it will be subject to the greatest scrutiny' " ( People v. Hollman, 79 N.Y.2d 181, 189, 581 N.Y.S.2d 619, 590 N.E.2d 204 [1992], quoting De Bour, 40 N.Y.2d at 220, 386 N.Y.S.2d 375, 352 N.E.2d 562 ). It is precisely because police interactions with the public are dynamic situations with the ***972 potential for misunderstanding between officer and individual, often leading to the escalation of tensions and intrusive law enforcement tactics, that judicial review is essential to rein in abuses. As the Court has previously recognized, judicial attention to the ways in which police action may exceed recognized bounds of authority both protects individuals and guides future conduct ( Hollman, 79 N.Y.2d at 189-193, 581 N.Y.S.2d 619, 590 N.E.2d 204 [clarifying the requirements laid out in De Bour ] ).
III.
Police-initiated encounters with the public are evaluated under the framework established in De Bour, which create a "gradation of permissible police authority," with each step defining the categorical *778 boundary for progressively heightened police intrusions ( De Bour, 40 N.Y.2d at 223, 386 N.Y.S.2d 375, 352 N.E.2d 562 ; see also Moore, 6 N.Y.3d at 498-499, 814 N.Y.S.2d 567, 847 N.E.2d 1141 ). At the first level, a "minimum intrusion ... to request information is permissible when there is some objective credible reason ... not necessarily indicative of criminality" ( De Bour, 40 N.Y.2d at 223, 386 N.Y.S.2d 375, 352 N.E.2d 562 ). At the second level, "a somewhat greater intrusion ... to the extent necessary to gain explanatory information, but short of a forcible seizure," is permitted on the "founded suspicion that criminal activity is afoot" ( id. ). At the third level, a forcible stop and detention is justified in those cases where the officer has "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor"; "[a] corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed" ( id. [citations omitted] ). At the fourth and highest level of police interference with a person's liberty, a person may be placed under arrest if the officer has probable cause to believe the individual "has committed a crime, or offense in [the officer's] presence" ( id. [citations omitted] ).[3] ***973 Defendant claims that when Officer Rodriguez saw him on the ninth floor, the officer did not have an objective, credible reason to approach and ask if defendant *779 lived in the building. We need not decide the propriety of the initial inquiry, however, because, as discussed by the Appellate Division dissent, there is no legal support for the defendant's subsequent detention and frisk. Regardless of whether Officer Rodriguez had "an objective, credible reason" to follow defendant simply because defendant pushed the button after the officer asked him to keep the elevator door open, when the officer approached defendant on the ninth floor, he had no information that defendant was involved in criminal activity, and defendant did nothing to provide reasonable suspicion that he had or was about to commit a crime. Thus, there was no justification for the officer's use of physical force-in other words, there was no support for a level three intrusion.
Where, as here, police have no advance information about any criminality ascribed to an individual, and that person stands motionless and silent when approached, the police may not stop and detain, nor grab and place the person under arrest, ***974 even if his shirtsleeve has a nondescript bulge. To illustrate the point, if defendant had been standing on a public street-in the heart of a "high crime area"-wearing a hoodie, with his arms pointed straight down, his hands covered by his sweater cuffs, and with one arm of his sleeve appearing "thicker" than the other as in an unshaped bulge, the police would have had no basis to approach and demand he answer questions. If there were no response from defendant in that hypothetical situation, they would also have had no right to grab his wrist and push up his sleeve. Such a level three intrusion is no less prohibited when an individual is in a residential building if the officers have no basis upon which to suspect that the person is involved in criminal activity.
Nevertheless, the People and the majority of this Court take the position that the circumstances of the encounter support a level three forcible intrusion. What are those circumstances? That the building was known for crime? An officer may not ascribe a suspicious nature to an individual simply because the person is observed in a high crime area (see People v. McIntosh, 96 N.Y.2d 521, 526-527, 730 N.Y.S.2d 265, 755 N.E.2d 329 [2001] ["a discrete area of a city identified as a high crime area has not, by itself, been sufficient justification for informational requests"] ). As the Court has previously observed, "many areas of New York City, at one time or another, have probably been described by the police as 'high crime neighborhoods' or 'narcotics-prone locations' .... If these circumstances could combine with flight to justify pursuit, then in essence the right to inquire would be tantamount to the right to seize, and there would, in fact, be no right 'to be let alone' "]; People v. Holmes, 81 N.Y.2d 1056, 1058, 601 N.Y.S.2d 459, 619 N.E.2d 396 [1993] ).
Is it that defendant did not respond to the officer's questions about where he lived or whether he was carrying a weapon? That cannot be enough either, because "while the police had the right to make the inquiry, defendant had a constitutional right not to respond" (see Howard, 50 N.Y.2d at 590, 430 N.Y.S.2d 578, 408 N.E.2d 908 [no probable cause existed where individual walked quickly away from police, ignored their requests to talk, and then ran away, as he had "the right to be let alone"] [citation omitted] ). Furthermore, if, as this Court has previously held, walking away from an officer and refusing to respond "cannot serve to create a reasonable suspicion of criminality," neither can staying put and ***975 remaining silent (see e.g. Moore, 6 N.Y.3d 496, 814 N.Y.S.2d 567, 847 N.E.2d 1141 [no reasonable suspicion existed where individual walked away from police, continuing after they yelled at him not to move]; *780 Holmes, 81 N.Y.2d at 1057-1058, 601 N.Y.S.2d 459, 601 N.Y.S.2d 459, 619 N.E.2d 396 [no reasonable suspicion existed where individual walked away as patrol car approached and then ran as officers exited the car, since flight alone is "insufficient to justify pursuit because an individual has a right 'to be let alone' and refuse to respond to police inquiry"]; People v. May, 81 N.Y.2d 725, 728, 593 N.Y.S.2d 760, 593 N.Y.S.2d 760, 609 N.E.2d 113 [1992] [individual moved car slowly away as police approached, which "could not serve to create a reasonable suspicion of criminality given defendant's right ... to refuse to respond to police inquiry"] [citation omitted] ). This case illustrates the imperative for judicial protection of the right to be left alone. As a resident of the building, how else could defendant exercise this right and not escalate the police encounter, other than to remain silent (see People v. Barksdale, 26 N.Y.3d 139, 150, 20 N.Y.S.3d 296, 41 N.E.3d 1111[2015, Rivera, J., dissenting] ["what happens if the person approached refuses to answer, and remains silent, or says, 'I do not have to talk to you.' Or, what if the individual simply walks away? Given that an individual in a police-initiated encounter may seek to exercise that person's 'right to be let alone,' and this Court's previous statements that an individual need not talk to an officer and may walk away from the police in a noncustodial encounter, the potential for escalation seems all too likely"] [citations omitted] ).
Upon what other circumstances could the People and the majority be relying? Is it that the officer observed defendant's arm was stiff and that his sleeve had a nondescript bulge? There is nothing suspicious to be inferred from a "stiff," "straight down" arm, as the testifying officer described it, nor is it "unnatural," as the majority states (maj. op. at 965, 73 N.Y.S.3d at 509, 96 N.E.3d at 773). Likewise, a nondescript bulge "is hardly indicative of criminality" ( Holmes, 81 N.Y.2d at 1058, 601 N.Y.S.2d 459, 619 N.E.2d 396 ). This Court has qualified the perennial bulge as a factor supporting police action only where the bulge has the shape or outline of a weapon, or viewed in an area of the body where weapons are typically worn (compare De Bour, 40 N.Y.2d at 221, 386 N.Y.S.2d 375, 352 N.E.2d 562, with Holmes, 81 N.Y.2d at 1058, 601 N.Y.S.2d 459, 619 N.E.2d 396 [no reasonable suspicion where "defendant st[ood] in an area known for drug trafficking with an unidentified bulge in his jacket pocket"], and People v. Stewart, 41 N.Y.2d 65, 69, 390 N.Y.S.2d 870, 359 N.E.2d 379 [1976] ["a bulge in the pocket, unlike a waistband bulge, could be caused by any number of innocuous objects. Moreover, the officer conceded that [they] could not have possibly known from ***976 the location and character of the bulge that the defendant was carrying a weapon"], and People v. Sanchez, 38 N.Y.2d 72, 74-75, 378 N.Y.S.2d 346, 340 N.E.2d 718 [1975] [an unshaped bulge in a front pocket area was "an insufficient ground for ... suspicion" and did not constitute a " 'particular fact[ ]' from which an inference could be drawn that defendant posed an imminent danger to (the officer)"] ). If any amorphous bulge were sufficient, the Court would have had no reason to discuss in prior cases the particularities of the shape of the bulge and its placement on defendant' body or clothing. Further, if any unshaped bulge were sufficient to permit a stop and frisk, De Bour's framework would be rendered meaningless. Every person wearing baggy pants or an oversized shirt would be susceptible to forced detention, and courts would have to decide whether a shirtsleeve was sufficiently thick and bulky to provide reasonable suspicion of criminal activity.[4] *781 De Bour was intended to prevent abusive and discriminatory police practices based on these types of vagaries and uncertainties. Individual rights do not depend on stereotype-based assumptions about dress style.
Was it that defendant did not show his hands, a detail the prosecutor was so keen to elicit at the suppression hearing? The officer also could not base defendant's forcible detention and frisk on defendant's failure to show his hands when the officer so ordered, because such action is a result, not a cause, of the police officer's inquiry. The People's argument to the contrary reveals a profound misunderstanding of the limits on police authorization set forth in De Bour. Applying the framework here, under level one Officer Rodriguez approached defendant to ask if he lived in the building based on his observations of defendant in the elevator.[5] At level two, where there is a founded suspicion of criminal activity, the officer is justified in ***977 asking questions that are "extended and accusatory and the officer's inquiry focuses on the possible criminality of the person approached" ( Hollman, 79 N.Y.2d at 191, 581 N.Y.S.2d 619, 590 N.E.2d 204 ). The founded suspicion must precede the officer's inquiry; it may not be a product of that intrusion. As the Court explained in De Bour:
"Before the police may stop a person pursuant to the common-law right to inquire there must exist at that moment a founded suspicion that criminal activity is present. The police may not justify a stop by a subsequently acquired suspicion resulting from the stop. This reasoning is the same which refuses to validate a search by what it produces. To validate this stop under the common-law power to inquire, we must examine the knowledge possessed at that moment and any reasonable inferences. Although this analysis involves a less stringent degree of belief than probable cause, it should be approached in the same manner so as to permit the use of familiar *782 signposts as points of reference" ( 40 N.Y.2d at 215-16 [386 N.Y.S.2d 375, 352 N.E.2d 562] [citations omitted] ).
Similarly, at level three, the officer must have a reasonable suspicion of particularized criminal action by the person the officer means to stop, basing that suspicion on circumstances prefacing the stop, not on the fact that the person refuses to respond (see, e.g., Stewart, 41 N.Y.2d at 69, 390 N.Y.S.2d 870, 359 N.E.2d 379 ["Before a police officer 'places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so' "], quoting Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 [1968] ). In Hollman, for example, observing two men on a bus place bags together then sit several feet away from those bags ***978 "gave rise to an objective credible reason, not necessarily indicative of criminality, for approaching the two men"; the men denying they brought any bags, despite officer's previous observation to the contrary, aroused "founded suspicion that criminality was afoot"; and only upon asking about ownership of the particular bags, a level two intrusion, and the men denying ownership did suspicion rise to allow the officer to lawfully search the bags ( 79 N.Y.2d at 193, 581 N.Y.S.2d 619, 590 N.E.2d 204 ). In comparison, where an individual appeared nervous, scanned the terminal, and hesitated upon eye contact with a police officer, the officer nonetheless "crossed the line ... when he asked to search the defendant's bag. The defendant's behavior, while it may have provided the officer with adequate basis for an approach and for a few general, nonaccusatory questions, was certainly not so suspicious as to warrant the further intrusion of a request to rummage through the defendant's luggage" ( id. at 194, 581 N.Y.S.2d 619, 590 N.E.2d 204 ; see also De Bour, 40 N.Y.2d at 216, 386 N.Y.S.2d 375, 352 N.E.2d 562 ). "Since a police encounter cannot be validated by a later-acquired suspicion, [an officer's] subsequent observations of defendant do not cleanse the initial request of its shortcomings under De Bour and Hollman" ( McIntosh, 96 N.Y.2d at 527, 730 N.Y.S.2d 265, 755 N.E.2d 329 [internal citation omitted] ). Nor can level two and three be collapsed such that the same conduct used to satisfy level two is recycled to provide reasonable suspicion for a forcible stop and frisk (see Moore, 6 N.Y.3d at 500, 814 N.Y.S.2d 567, 847 N.E.2d 1141 ). Thus, the officer did not have a founded or reasonable suspicion of criminal activity based on defendant's nonresponse.
The People's reliance on defendant's placement of his hands and failure to comply with the officer's demands suggests that members of the public must affirmatively respond to officers or risk forfeiting their freedom, a proposition we have clearly and unequivocally rejected. As the Court explained in Moore, "[i]f merely walking away from the police were sufficient to raise the level of suspicion to reasonable suspicion-and a suspect who attempted to move could be required to remain in place at the risk of forcible detention-the common-law right of inquiry would be tantamount to the right to conduct a forcible stop and the suspect would be effectively seized whenever only a common-law right of inquiry was justified" ( 6 N.Y.3d at 500, 814 N.Y.S.2d 567, 847 N.E.2d 1141 [citation omitted] ). Rather, "innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand" ( id., quoting De Bour, 40 N.Y.2d at 216, 386 N.Y.S.2d 375, 352 N.E.2d 562 ).
***979 For the reasons I have discussed, none of these circumstances, in isolation or cumulatively, establishes reasonable suspicion that defendant had or was about to commit a crime[6] (see *783 People v. Carrasquil lo, 54 N.Y.2d 248, 445 N.Y.S.2d 97, 429 N.E.2d 775 [1981] ["untidy clothes" and "frizzled up" hair, meeting an officer's eyes, and subsequently making a "quick" turn at a corner, "neither singly nor in combination, constituted other than innocuous behavior, sole reliance on which would impermissibly reduce the foundation for an intrusion to nothing but whim or caprice"] [internal citation marks and citations excluded] ). When defendant remained silent and turned to face the wall, "the officers had no information that a crime had occurred or was about to take place, had not seen defendant do anything criminal, and were confronted only by facts susceptible of innocent interpretation" (see Howard, 50 N.Y.2d at 590, 430 N.Y.S.2d 578, 408 N.E.2d 908 ). At that point, defendant "remained free to continue about his business without risk of forcible detention" (see Moore, 6 N.Y.3d at 500, 814 N.Y.S.2d 567, 847 N.E.2d 1141 ), and the police should have honored his right to be left alone.
The People's claim that defendant's failure to act-that he said nothing and did nothing despite the officer's demands for a response-justified the heightened intrusion turns the law on its head. The governing premise of the De Bour framework is that a greater police intrusion is permissible only after the situation escalates. In other words, that "various intensities of police action are justifiable" only "as the precipitating and attendant factors increase in weight and competence" ( De Bour, 40 N.Y.2d at 223, 386 N.Y.S.2d 375, 352 N.E.2d 562 ). It is because of the potential for abuse, given "the rapidity with which suspicion can escalate," that "we must place limits on the power of the police to pick out targets and subject them to invasive questioning based on nothing more than the objective and credible reason required for a request for information" ( Hollman, 79 N.Y.2d at 191, 581 N.Y.S.2d 619, 590 N.E.2d 204 ).
IV.
As I have previously argued, police encounters must be scrutinized carefully for constitutional compliance in order to avoid the criminalization of indeterminate behavior based on the nature of the surroundings or a person's attempts to avoid ***980 contact with law enforcement (see Barksdale, 26 N.Y.3d at 144, 20 N.Y.S.3d 296, 41 N.E.3d 1111 [Rivera, J. dissenting]; People v. Argyris, 24 N.Y.3d 1138, 1169, 3 N.Y.S.3d 711, 27 N.E.3d 425 [2014] [Rivera, J. dissenting]; People v. Clermont, 22 N.Y.3d 931, 934, 977 N.Y.S.2d 704, 999 N.E.2d 1149 [2013] [Rivera, J. dissenting] ). Our Court's recent approach to police interactions with the public, both on the streets and private property-including the decision in the instant appeal-risks authorizing the escalation of police-initiated encounters where a person exercises the right to be left alone, giving license to violations of the right to privacy. I believe the Court is charting a dangerous course, one that has the potential to render appellate judicial review meaningless, imperil individual liberty, and diminish civil rights. Therefore, I dissent.
Order, insofar as appealed from, affirmed, in a memorandum.
Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur; Judge Rivera dissents in an opinion in which Judge Wilson concurs.

NYCHA is a state agency that administers public housing and the federal Section 8 rent subsidy program. About 400,000 low-to-moderate-income New Yorkers currently reside in its buildings, and about 235,000 New Yorkers receive Section 8 subsidies (see About NYCHA, NYC Housing Authority, http://www1.nyc.gov/site/nycha/about/aboutnycha.page [accessed March 6, 2018] ).

Defendant's brief to our Court limits his appeal to the suppression issues. I address only those matters concerning the propriety of defendant's forcible detention and frisk.

Defendant does not ask this Court to reconsider the continued vitality of De Bour's framework for measuring the constitutionality of police actions, but argues that the officers' conduct here did not comport with De Bour and its progeny. There has been recent interest in whether the approach De Bour sanctions should be reevaluated by the legislature or the courts. At a New York City Bar Association event marking De Bour' s four-decade anniversary, former Chief Judge Sol Wachtler, De Bour's author, was quoted as stating, "that's too long for a precedent of this sort, when you consider the change in communities, the change in morality, [and] the change in our sense of justice " (Andrew Denney, After 40 Years, 'De Bour' Author Sees Need for a Fresh Look, NYLJ, May 23, 2016). Tellingly, many have critiqued De Bour as encouraging abusive police practices (see, e.g., Emily J. Sack, Police Approaches and Inquiries on the Streets of New York: The Aftermath of People v. De Bour, 66 NYU L Rev 512, 520, 548-53 [1991] [observing that "the courts routinely conflate the De Bour standards and use inappropriately low levels of suspicion to justify police intrusions," and that "the multitiered structure of the De Bour model allows inadequately justified low-level intrusions to escalate quickly into inappropriate forcible stops and arrests"], cited in Ligon v. City of New York, 925 F.Supp.2d 478, 533 n. 398 [S.D.N.Y. 2013] [further noting, "[t]he NYPD's training materials may illustrate the risk created by the multi-level doctrine of De Bour. The mere existence of De Bour Level 2, and the inevitable difficulty of clearly distinguishing an encounter on the more intrusive end of Level 2 from an encounter on the less intrusive end of Level 3, creates problems of administrability. In practice, the possibility of classifying a stop as Level 2 or even Level 1 may lead police to perform a large number of stops-in the ordinary sense of the word, but inevitably often in the Terry sense as well-without the minimal foundation in reasonable suspicion required by the U.S. Constitution"]; Dasha Kabakova, The Lack of Accountability for the New York Police Department's Investigative Stops, 10 Cardozo Pub L Pol'y & Ethics J 539, 562-63 [2012] ["in precincts in which blacks are less than 10% of the population, 'blacks remained over two times (2.17) more likely to be 'stopped' on suspicion of committing a violent crime than whites ... [and] these differences are evident after controlling for race- and crime- specific arrest rates (within each precinct).' The statistic was the same for stops under suspicion of weapons crimes. In contrast, blacks were half as likely as whites to be stopped under suspicion of property crimes in all precincts"] [citation omitted] ). Defendant's case similarly falls in the De Bour borderlands, straddling the line between levels 2 and 3, and highlights some of our framework's problems.

The "hoodie"-worn by defendant here, and which the testifying officer mentioned in his initial description of the defendant, his answer for why he followed defendant upstairs, and his description of the circumstances that led him to grab defendant's arm-is a garment particularly susceptible to improper mischaracterization as representing criminal character and justifying raised suspicion (see Cynthia Lee, Making Race Salient: Trayvon Martin and Implicit Bias in a Not Yet Post-Racial Society, 91 NCL Rev 1555, 1575-1585, 1576 n 122 [2013] [citing, inter alia, Katherine Boyle, The Hoodie as Label, Wash Post, Mar 26, 2012, at C1] ).

I assume for the purposes of my analysis that the level one inquiry was proper, yet, arguably, there was no legal basis for approaching defendant and asking identification questions. Officer Rodriguez testified that he followed defendant to ask where he lived because, when he saw defendant, defendant was wearing a hoodie, and stepped out of and back into the elevator. While "police officers have fairly broad authority to approach individuals and ask questions relating to identity or destination," that intrusion is only permissible where "the officers do not act on whim or caprice and have an articulable reason not necessarily related to criminality for making the approach (Hollman, 79 N.Y.2d at 190, 581 N.Y.S.2d 619, 590 N.E.2d 204, citing De Bour, 40 N.Y.2d at 219, 386 N.Y.S.2d 375, 352 N.E.2d 562 ). Officer Rodriguez, therefore, was prohibited from acting as he did when he approached and asked defendant questions simply because defendant exercised his constitutional right not to engage with the police. In fact, there is even some question as to whether that was defendant's intent when he pushed the elevator button, since he only traveled up two floors, unlikely to be sufficient for escape. Then, when he was approached by officers on the ninth floor, rather than flee, he merely sought to avoid interaction and potential conflict. In that tense situation, in which a body movement, or even eye movement, could be misinterpreted as "furtive," "sudden," or "dangerous," raising alarm in the officers and potentially costing an individual their life, it was, at the very least, not suspicious for defendant to turn around and face the wall, remaining silent and motionless.

Since the People's evidence does not satisfy the "minimum showing necessary" to warrant a level three forcible detainment and frisk (McRay, 51 N.Y.2d 594, 435 N.Y.S.2d 679, 416 N.E.2d 1015 ), a fortiori , under the majority's mixed question analysis there is no record support for the lower courts' determination that the police acted appropriately.